OPINION OF THE COURT
Shirley Werner Kornreich, J.
This action arises from an insurance and indemnity agreement (the I&I) between plaintiff Assured Guaranty Municipal Corp.[1] (Assured) and various other parties to a securitization transaction of residential mortgage loans. These parties were: defendants DB Structured Products, Inc. (DBSP) and ACE Securities Corp. (ACE); third-party defendant GreenPoint Mortgage Funding, Inc. (GreenPoint); and ACE Home Equity Loan Trust, Series 2006-GP1 (the Trust), which is a nonparty to this action.
In the complaint, Assured alleges, inter alia, that defendants breached certain representations and warranties contained in the I&I.[2] In its third-party complaint, defendant and third-party plaintiff DBSP alleges that if the representations and warranties made by DBSP to Assured have been breached, then Green-Point must indemnify DBSP under an indemnification provision contained in a “Master Revolving Credit Loan Purchase and Servicing Agreement” (the PSA) between GreenPoint and DBSP
GreenPoint moves to dismiss the third-party complaint. DBSP opposes the motion.
*723 I. Background
The following facts are drawn from the complaint and the third-party complaint unless otherwise indicated.
A. The Securitization Transaction
DBSP and GreenPoint entered into the PSA on February 1, 2006. (See Potter aff, exhibit D.) Pursuant to this agreement, DBSP purchased 6,293 residential mortgage loans (the HELOCs)[3] from GreenPoint, an originator of such loans. (See Potter aff, exhibit C 1Í 5.) DBSP resold the HELOCs to ACE pursuant to a “HELOC Purchase Agreement.” (See Potter aff, exhibit C If 7; Kelly-Najah aff, exhibit C.) ACE, in turn, deposited the HELOCs in the Trust pursuant to a “Sale and Servicing Agreement” (the SSA). (See Goldfarb aff, exhibit L.) The outstanding principal balance on the HELOCs received by the Trust was in excess of $352 million. The Trust issued securities backed by the cash flow from the HELOCs (the notes). (Id.) The notes were sold to investors. (Id.) DBSP received through ACE the proceeds from the sale of the notes. (Id.) Pursuant to the I&I, Assured insured certain payments to be made to investors under the terms of the notes. (See Kelly-Najah aff, exhibit D.)
B. Assured’s Complaint
On June 23, 2010, Assured filed a complaint against DBSP and ACE. In the complaint, Assured alleges that the HELOCs “have failed miserably.” (See Potter aff, exhibit A II 42.) Specifically, according to Assured, “[a]s of May 26, 2010 . . . cumulative pool losses are already more than $122 million.” (Id.) Assured’s resulting claim payments to the insured noteholders, as of the date of the complaint, exceeded $93.5 million. (Id.)
In late 2007, Assured engaged third-party consultants “to review the files created during the origination of several hundred of the securitized HELOCs that had defaulted.” (See Potter aff, exhibit A H 43.) The consultants “reviewed 640 defaulted HELOCs.” (Id.) According to the complaint, the consultants found:
*724 “(1) rampant fraud, primarily involving misrepresentation of the borrower’s income, assets, employment, or intent to occupy the property as the borrower’s residence (rather than as an investment), and subsequent failure to so occupy the property;
“(2) failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property; and
“(3) pervasive violations of GreenPoint’s own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum, or (v) with relationships to GreenPoint or other non-arm’s length relationships.” (See Potter aff, exhibit A 11 44 [emphasis supplied].)
Based on these findings, Assured contends that defendants breached their representations and warranties contained in section 6 of the HPA and section 2.01 of the I&I. (See Potter aff, exhibit A 1i 44.)
1. Breach of Representations and Warranties in Section 6 of the HPA
In the complaint, Assured identifies the following representations and warranties in section 6 of the HPA as breached:
“HPA § 6 (ii): No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a HELOC has taken place on the part of any person, including without limitation the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the HELOCs or in the application of any insurance in relation to such HELOC; . . .
“HPA § 6 (xiv): There is no material default, breach, violation event or event of acceleration existing under the mortgage or the Credit Line Agreement and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration, and the Seller [DBSP] has not, nor has its predecessors, waived *725 any material default, breach, violation or event of acceleration; . . .
“HPA § 6 (xxiii): The HELOCs were underwritten in accordance with the originators’s [GreenPoint’s] underwriting guidelines in effect at the time the HELOCs were originated (the ‘Applicable Underwriting Guidelines’), except with respect to certain of those HELOCs which had compensating factors permitting a deviation from the Applicable Underwriting Guidelines; . . .
“HPA § 6 (xxx): The Loan File contains an appraisal of the related Mortgaged Property which was made prior to the approval of the HELOC by a qualified appraiser, duly appointed by the related originator and was made in accordance with the Financial Institutions Reform, Recovery, and Enforcement Act of 1989;. . .
“HPA § 6 (lii): The information set forth in the Closing Schedule is true and correct in all material respects as of the Cut-Off Date[4] . . .
“HPA § 6 (lxiii): As of the Cut-Off Date, no HELOC had a Combined Loan to Value Ratio of more than 100%.” (See Potter aff, exhibit A II 26 [emphasis supplied].)
2. Breach of Representations and Warranties in Section 2,01 of the I&I
In the complaint, Assured identifies the following representations and warranties in section 2.01 of the I&I as breached:
“I&I § 2.01 (i): None of the Transaction Documents[5] contain any statement of a material fact with respect to [DBSP or ACE] or the Transaction Documents or HELOCs that was untrue or misleading in any material respects when made. Since the furnishing of the Transaction Documents, there has been no change, nor any development or event involving a prospective change known to [DBSP or ACE], that would render any of the Transaction Documents untrue or misleading in any material re *726 spect. There is no fact known to [DBSP or ACE] which has a material possibility of causing a Material Adverse Change with respect to [DBSP], [ACE] or the HELOCs.
“I&I § 2.01 (j): The offer and sale of the securities comply in all material respects with all requirements of law, including requirements of applicable securities laws. Without limitation of the foregoing, and except with respect to information provided in writing by [Assured] expressly for use in the Offering Documents (such information being limited to the information included under the caption ‘The Note Insurer’ and the financial statements incorporated by reference therein) . . . the Offering Document does not contain any untrue statement of a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading;
“I&I § 2.01 (k): Each of the representations and warranties of [DBSP and ACE] contained in the Transaction Documents is true and correct in all material respects and [DBSP and ACE] hereby make[ ] each such representation and warranty to, and for the benefit of [Assured] as if the same were set forth in full herein; . . .
“I&I § 2.01 (q): The information supplied by [DBSP and ACE] to S&P and Moody’s in connection with obtaining the respective ratings of the Securities did not contain any untrue statement of a material fact or omit to state any material fact required to be stated in order to make. such information not misleading.” (See Potter aff, exhibit A 1HI 32, 34.)
With respect to the I&I, Assured alleges that DBSP and ACE breached their representations and warranties in section 2.01 (j) because
“the Offering Document that [DBSP/ACE] and [their] affiliates prepared to market the Notes did not adequately or accurately disclose the true attributes of the HELOC’s, the level of fraud and underwriting failings permeating the [DBSP/ACE] loan pool, or the grossly deficient origination and underwriting practices of GreenPoint, the originator of the loans.” (See Potter aff, exhibit A If 49 [emphasis supplied].)
*727 Assured’s complaint singles out the Prospectus Supplement (ProSupp) as the offering document that suffers from the alleged failure to disclose. It alleges that the disclosures in the ProSupp
“contained false and misleading information because they materially misrepresented, on a pool-wide basis, key loan metrics and the quality of the origination and underwriting of the HELOCs. The disclosures also contained material omissions because they failed to disclose the abysmal origination, underwriting, and due-diligence practices and procedures that account for the incredible incidence of fraud and gross underwriting failings plaguing the HELOCs.” (See Potter aff, exhibit A 11 38 [emphasis supplied].)
The complaint summarizes the problematic representations of the ProSupp as follows:
“[w]ith respect to the underwriting of the HELOCs that GreenPoint had performed in connection with the loans’ origination, the ProSupp includes an assurance . . . that the HELOCs were underwritten and issued in a prudent fashion. . . . [T]he Pro-Supp states that, ‘the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower’s credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.’ . . . The ProSupp further specifies that ‘[a]s part of its evaluation of potential borrower, GreenPoint generally requires a description of the borrower’s income,’ and that adequate compensating factors are required to be present in order to make loans to borrowers with debt-to-income ratio in excess of 40%. . . . With respect to GreenPoint’s ‘no doc’ or ‘low-doc’ loan-origination programs, the Pro-Supp assured investors that the borrowers participating in such programs had ‘credit histories that demonstrate an established ability to repay indebtedness in a timely fashion. ’ . . . The ProSupp also claimed that GreenPoint conducted a ‘quality control review’ of a sample of the loans that it had acquired from ‘approved correspondent lenders.’ . . . Finally, the ProSupp represented that, ‘[i]n determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing.’ ” (See Potter aff, exhibit A 1T1Í 36-37 [emphasis supplied].)
*728 Assured also alleges that DBSP and ACE breached their representations and warranties in section 2.01 (q) of the I&I because the data that DBSP and ACE provided to two rating agencies, S&P and Moody’s, were false and misleading. (See Potter aff, exhibit A H 39.) The data at issue “pertain[ed] to the HELOC’s, including the borrowers’ debt-to-income ratios and combined loan-to-value ratios.” (Id.)
C. GreenPoint’s Representations and Warranties to DBSP
In the PSA, GreenPoint made the following general representations and warranties:
“PSA § 7.01 (xiii): Neither this Agreement nor any written statement, report or other document prepared and furnished or to be prepared and furnished by the Seller [GreenPoint] pursuant to this Agreement or in connection with the transactions contemplated hereby[6] contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.” (See Potter aff, exhibit D.)
GreenPoint also made representations and warranties regarding individual revolving credit loans. (See Potter aff, exhibit D, § 7.02.) Specifically, GreenPoint represented and warranted to DBSP that “as to each Revolving Credit Loan, as of the related Closing Date for such Revolving Credit Loan”:
“PSA § 7.02 (i): The information set forth in the related Revolving Credit Loan Schedule and the Revolving Credit Loan data delivered to [DBSP] is complete, true and correct; . . .
“PSA § 7.02 (xviii): There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute default, breach, violation or event of acceleration, and [GreenPoint] has not waived any default, breach, violation or event of acceleration; . . .
“PSA § 7.02 (xxiii): The origination and collection *729 practices used by [GreenPoint] with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent, and customary in the mortgage origination and servicing industry; . . . “PSA § 7.02 (xxvii): The Revolving Credit Loan was underwritten in accordance with the Underwriting Guidelines of [GreenPoint] in effect at the time the Revolving Credit Loan was originated; . . .
“PSA § 7.02 (xxix): The Mortgage File contains an appraisal of the related Mortgage Property which, (a) with respect to First Lien Revolving Credit Loans [and] ...(b) with respect to Second Lien Revolving Credit Loans . . . was made and signed, prior to the approval of the Revolving Credit Loan application, by a qualified appraiser, duly appointed by [GreenPoint] .... Each appraisal of the Revolving Credit Loan was made in accordance with the relevant provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989;. . .
“PSA § 7.02 (xxxvii): No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Revolving Credit Loan has taken place on the part of any person, including without limitation the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Revolving Credit Loan or in the application of any insurance in relation to such Revolving Credit Loan; . . .
“PSA § 7.02 (xlviii): No selection procedures were used by [GreenPoint] that identified the Revolving Credit Loans as being less desirable or valuable than other comparable Revolving Credit Loans in [Green-Point’s] portfolio;
“PSA § 7.02 (xlix): No Revolving Credit Loan has an LTV [Loan-to-Value] or CLTV [Combined-Loan-to-Value], as applicable, in excess of 90% or 100%, respectively, and no second lien Revolving Loan has an Equity LTV in excess of 100%; . . .
“PSA § 7.02 (lii): Each Revolving Credit Loan has a valid and original Credit Score, with a minimum Credit Score as set forth in the related Commitment Letter; . . .
“PSA § 7.02 (liv): No Mortgagor is the obligor on more than two Mortgage Notes; . . .
*730 “PSA § 7.02 (lxiii): No predatory, abusive or deceptive lending practices, including but not limited to, the extension of credit to a Mortgagor without regard for the Mortgagor’s ability to repay the Revolving Credit Loan and the extension of credit to a Mortgagor which has no tangible net benefit to the Mortgagor, were employed in connection with the origination of the Revolving Credit Loan; . . .
“PSA § 7.02 (lxv): No Mortgagor was encouraged or required to select a Revolving Credit Loan product offered by [GreenPoint] which is a higher cost product designed for less creditworthy borrowers, unless at the time of the related Revolving Credit Loan’s origination, such Mortgagor did not qualify taking into account credit history and debt to income ratios for a lower cost credit product then offered by [GreenPoint] or any affiliate of [GreenPoint] ....
“PSA § 7.02 (Ixvi): The methodology used in underwriting the extension of credit for each Revolving Credit Loan employs objective mathematical principles which relate the Mortgagor’s income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the Mortgagor’s equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that at the time of origination (application/ approval) the Mortgagor had a reasonable ability to make timely payments on the Revolving Credit Loan.” (See Potter aff, exhibit D [emphasis supplied].)
D. DBSP’s Remedies under the PSA
Under the PSA, DBSP has two remedies for breach of Green-Point’s representations and warranties: (1) an indemnification remedy; and (2) a “cure-or-repurchase remedy” (the CRR). Regarding the indemnification remedy, the PSA provides that GreenPoint
“shall indemnify the Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of [GreenPoint’s] representations and *731 warranties.” (See Potter aff, exhibit D, § 7.03 [emphasis supplied].)
The indemnification remedy is “in addition to” the CRR remedy, the elements of which are described below. (Id.)
The CRR remedy operates in three steps:
Step one: (Discovery)
“Upon discovery by . . . [DBSP] of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of the Revolving Credit Loans or the interest of [DBSP] (or which materially and adversely affects the interests of [DBSP] in the related Revolving Credit Loan in the case of a representation and warranty relating to a particular Revolving Credit Loan), . . . [DBSP] shall give prompt written notice to [GreenPoint].” (See Potter aff, exhibit D, § 7.03.)
Step 2: (Cure)
“Within sixty (60) days . . . of. . . notice to [Green-Point] of any breach of a representation or warranty which materially and adversely affects the value of a Revolving Credit Loan or the Revolving Credit Loans, [GreenPoint] shall use its best efforts promptly to cure such breach in all material respects . . ..” (Id.)
Step 3: (Repurchase) “[I]f such breach cannot be cured, [GreenPoint] shall, at [DBSP’s] option, repurchase such Revolving Credit Loan at the Repurchase Price within two (2) Business Days following the expiration of the related cure period.” (Id.)
The PSA further provides that
“[a]ny cause of action against [Greenpoint] relating to or arising out of the breach of any representations and warranties . . . shall accrue as to any Revolving Credit Loan upon (i) discovery of such breach by [DBSP] . . . ; (ii) failure by [GreenPoint] to cure such breach or repurchase such Revolving Credit Loan as specified above, and (iii) demand upon [Greenpoint] by [DBSP] for compliance with the relevant provisions of this Agreement.” (See Potter aff, exhibit D, § 7.03 [emphasis supplied].)
E. DBSP’s Third-Party Complaint and Supporting Affidavits
On September 13, 2010, DBSP filed a third-party complaint against GreenPoint asserting four causes of action: (1) indemni *732 fication under section 7.03 of the PSA; (2) breach of representations and warranties under section 7.02 of the PSA; (3) breach of representations and warranties under section 7.01 of the PSA; and (4) breach of the cure-or-repurchase obligation under section 7.03 of the PSA.
By letter dated November 4, 2009, counsel for DBSP notified GreenPoint that DBSP had received three notices from Assured which notified DBSP of alleged breaches of certain representations and warranties made by DBSP to ACE under the HPA. CSee Kelly-Najah aff, exhibit J, at 2.) GreenPoint was also copied on Assured’s breach notices to DBSP (See Kelly-Najah aff, exhibits F, G, H, I.) In the November 4, 2009 letter, DBSP’s counsel advised GreenPoint that “the reported breaches from [Assured] with respect to such Revolving Credit Loans would constitute breaches of certain representations and warranties made by [GreenPoint] to DBSP under Section 7.02 of the [PSA] ... to the extent such alleged breaches were valid breaches.” (See Kelly-Najah aff, exhibit J, at 2.)
In the same letter, counsel for DBSP informed GreenPoint that “DBSP has reviewed and discussed with [Assured] the notices and related exhibits sent by [Assured] notifying DBSP of alleged breaches of certain representations and warranties made by DBSP under the [HPA] with respect to Revolving Credit Loans identified on Schedule 1-A attached hereto (the ‘Breached Insurer Loans’).” (See Kelly-Najah aff, exhibit J, at 2.) Schedule 1-A identified six revolving credit loans totaling $333,508.87. (See id.) The letter stated that as to these six loans “DBSP and [Assured] have mutually agreed that . . . the alleged breaches of certain representations and warranties made by DBSP under the [HPA] are valid breaches.” (Id. [emphasis supplied].)
DBSP’s letter stated that the breaches with respect to the breached insurer loans constitute breaches of certain representations and warranties made by GreenPoint to DBSP under section 7.02 of the PSA. (Id.) The letter further stated that “[p]ursuant to Section 7.03 of the [PSA] DBSP hereby notifies [GreenPoint] that [GreenPoint] has sixty (60) calendar days . . . following your receipt of this letter to cure such breaches or repurchase such revolving Credit loans and to indemnify DBSP . . . .” (Id.)[7] DBSP alleges that GreenPoint refused to cure the claimed breaches or repurchase any of the breached *733 insurer loans. DBSP claims that prior to filing the third-party complaint, it reiterated its demand to GreenPoint in an August 24, 2010 letter but was similarly rebuffed. (See Kelly-Najah aff, exhibit A lili 15, 35; exhibit K.)
II. Discussion
A. Standard of Review in Motion to Dismiss Third-Party Complaint
On a motion to dismiss, the court must accept the facts as alleged in the complaint as true, accord plaintiff the benefit of every favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory. (Morone v Morone, 50 NY2d 481, 484 [1980]; Rovello v Orofino Realty Co., 40 NY2d 633, 634 [1976]; Skillgames, LLC v Brody, 1 AD3d 247, 250 [1st Dept 2003].) CPLR 3026 mandates that ££[p]leadings shall be liberally construed. Defects shall be ignored if a substantial right of a party is not prejudiced.” ££[T]he criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one.” (Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977]; Rovello, 40 NY2d at 636.) In assessing the motion, a court may freely consider affidavits submitted by the plaintiff to remedy any defects in the complaint. (Rovello, 40 NY2d at 635-636.) When the moving party submits affidavits or other documentary evidence in support of its motion, dismissal under CPLR 3211 is warranted “only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law.” (Leon v Martinez, 84 NY2d 83, 88 [1994].)
The standard of review in a third-party defendant’s motion to dismiss is even more liberal: “the mere possibility of a claim over sustains the sufficiency of the third-party pleading.” (Braun v City of New York, 17 AD2d 264, 268 [1st Dept 1962].) The First Department explained the policy behind this lower scrutiny in Humble Oil & Ref. Co. v Kellogg Co.:
“We should not expect the third-party complaint to spell out a cause of action against the third-party defendant with the same precision required of the complaint in the main action. To compel it to do so would be to compel it to make out the plaintiff’s *734 case in advance. It is defending that case and not prosecuting it. To compel it to plead with precision could well lay a foundation for a motion by the plaintiff for summary judgment or for judgment on the pleadings against it. Its complaint is really a defensive measure for its protection only in the event that it should, upon trial, be held liable to the plaintiff solely because of another’s primary negligence.” (13 AD2d 754, 754 [1st Dept 1961].)
GreenPoint advances two main arguments in support of its motion to dismiss DBSP’s third-party complaint. It first argues that “DBSP’s indemnification claim [the first cause of action] against GreenPoint fails because GreenPoint’s agreement to indemnify DBSP does not cover [Assured’s] claims against DBSP for breach of DBSP’s representations and warranties.” (See GreenPoint’s mem of law at 5.) GreenPoint then argues that DBSP’s claims for breach of representations and warranties under sections 7.01 and 7.02 of the PSA (the second and third causes of action) and breach of the cure-or-repurchase obligations under section 7.03 of the PSA (the fourth cause of action) fail to state causes of action because certain conditions precedent in the PSA have not been satisfied. Both arguments fail for the reasons stated below.
B. The Scope of the Indemnification Provision
“Indemnity agreements should be strictly construed, and a promise to indemnify should not be found unless clearly implied in the language of the Agreement.” (Taussig v Clipper Group, L.P., 13 AD3d 166, 167 [1st Dept 2004].) “If a plaintiff sues on a warranty and if the defendant has a warranty from the third-party coextensive with the warranty given to the plaintiff by the defendant then a third-party complaint [for indemnity] will stand against a third-party defendant.” (Humble Oil, 13 AD2d at 755.) The mere fact that “the warranties were made by and to different parties,” does not foreclose the third-party indemnity claim. (Debby Jr. Coat & Suit Co. v Wollman Mills, Inc., 207 Misc 330, 332 [Sup Ct, Special Term, NY County 1955].)
Further, “the permissibility of impleader should not depend upon any legalistic test of identity between the two causes of action, but rather upon the existence of one or more substantial issues of law or fact common to both controversies.” (See id. at 334; see also Schoenfeld v Cake Nook, Inc., 17 Misc 2d 69, 71 [Sup Ct, Westchester County 1959] [impleader was held proper *735 where “a sufficient relationship exist(ed) between the facts alleged in the plaintiffs complaint and those alleged in the third-party complaint”].) It is “[sufficient that the complaint of the original plaintiff is broad enough to make possible a decision against the defendant despite the fact that it was the third-party defendant who alone was guilty of primary or active negligence.” {Humble Oil, 13 AD2d at 754.) “What is said with respect to actions based in negligence, of course, governs in connection with actions based on indemnity.” {Id. at 755.)
GreenPoint argues that (1) Assured’s complaint against DBSP alleges only breaches of DBSP’s own representations and warranties to Assured in the HPA and I&I; (2) GreenPoint only agreed to indemnify DBSP against claims based on GreenPoint’s representations and warranties in the PSA; therefore, (3) Green-Point’s agreement to indemnify DBSP does not cover Assured’s claims against DBSP for breach of DBSP’s representations and warranties to Assured. {See GreenPoint’s mem of law at 6.) GreenPoint’s inference fails.
The law is clear that
“[i]f a plaintiff [here Assured] sues on a warranty [here the I&I and HPA warranties] and if the defendant [here DBSP] has a warranty [here the PSA warranties] from the third-party [here GreenPoint] coextensive with the warranty given to the plaintiff [Assured] by the defendant [DBSP] then a third-party complaint [for indemnity] will stand against a third-party defendant [GreenPoint].” {See Humble Oil, 13 AD2d at 755 [emphasis supplied].)
GreenPoint fails to “conclusively establish[ ]” through documentary evidence that the DBSP and ACE representations and warranties implicated in Assured’s complaint are not coextensive with those that GreenPoint made in the PSA. {See Leon, 84 NY2d at 88.)
GreenPoint argues that the “representations and warranties are contained in separate contracts between separate parties.” {See GreenPoint’s mem of law at 6-7.) This is not sufficient to show that the two sets of representations and warranties are not coextensive. {See Debby Jr., 207 Misc at 333 [“While the warranties were made by and to different parties, they are otherwise identical in fact and in law and the claim of breach is the same”].) On the contrary, documentary evidence shows that the DBSP/ACE representations and warranties in the I&I and HPA implicated in Assured’s complaint are coextensive with the *736 representations and warranties made by GreenPoint in the PSA. (See discussion, supra at 6-16; compare HPA § 6 [ii], PSA § 7.02 [xxxvii]; HPA § 6 [xxiii], PSA § 7.02 [xxvii]; HPA § 6 [xxx], PSA § 7.02 [xxix]; HPA § 6 [lii], PSA § 7.02 [i]; HPA § 6 [Ixiii], PSA § 7.02 [xlix]; I&I § 2.01 [i], PSA § 7.01 [xiii].)
Further, the representations at issue in the ProSupp, which are incorporated by reference in the I&I through section 2.01 (j),[8] are directly tied to representations and warranties made by GreenPoint in the PSA.[9] The same is true of the representations allegedly made by DBSP and/or ACE to the rating agencies, which are incorporated by reference in the I&I through section 2.01 (q).[10], [11]
Section 2.01 (q) of the I&I completes the list of representations and warranties at issue in Assured’s complaint.[12] As discussed, each of these representations and warranties are directly tied to, and prima facie coextensive with, one or more representations and warranties made by GreenPoint in the PSA. The court cannot, therefore, hold that, as a matter of law, the representations and warranties by DBSP/ACE to Assured and those by GreenPoint to DBSP are not coextensive. Consequently, *737 much more than “the mere possibility of a claim” against GreenPoint exists to “sustain[ ] the sufficiency of [DBSP’s] third-party pleading.” (See Braun, 17 AD2d at 268; Humble Oil, 13 AD2d at 755.)
Finally, GreenPoint argues that a promise by GreenPoint to indemnify DBSP for breaches of DBSP’s representations and warranties to Assured cannot be “clearly implied in the language” of section 7.03 of the PSA, if the latter is “strictly construed.” (See GreenPoint’s reply mem of law at 3-4; see also Taussig, 13 AD3d at 167.) The court disagrees. In section 7.03 of the PSA GreenPoint promises to indemnify DBSP for losses and/or expenses that DBSP incurs “[as a] result[ ] [of] any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of [GreenPoint’s] representations and warranties” (emphasis supplied). GreenPoint fails to show that the losses and/or expenses that DBSP would incur in connection with Assured’s complaint do not “result[ ] from . . . breach[es] of [GreenPoint’s] representations and warranties.”
The factual underpinning of Assured’s complaint is the allegation that its consultants reviewed 640 defaulted HELOCs and found:
“(1) rampant fraud, primarily involving misrepresentation of the borrower’s income, assets, employment, or intent to occupy the property as the borrower’s residence (rather than as an investment), and subsequent failure to so occupy the property;
“(2) failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property; and
“(3) pervasive violations of GreenPoint’s own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum, or (v) with relationships to GreenPoint or other non-arm’s length relationships.” (See Potter aff, exhibit A K1Í 43, 44 [emphasis supplied].)
All three groups of allegations concern exclusively facts and events at play during the origination stage, that is, before DBSP and/or ACE were involved in the securitization process. These *738 allegations, if true, would establish a breach by DBSP and/or ACE of their representations and warranties to Assured. However, they would also establish a breach by GreenPoint of coextensive representations and warranties to DBSR including the following:
“PSA § 7.02 (xxiii): The origination and collection practices used by [GreenPoint] with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent, and customary in the mortgage origination and servicing industry; . . .
“PSA § 7.02 (xxxvii): No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Revolving Credit Loan has taken place on the part of any person, including without limitation the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Revolving Credit Loan or in the application of any insurance in relation to such Revolving Credit Loan; . . .
“PSA § 7.02 (lii): Each Revolving Credit Loan has a valid and original Credit Score, with a minimum Credit Score as set forth in the related Commitment Letter; . . .
“PSA § 7.02 (liv): No Mortgagor is the obligor on more than two Mortgage Notes; . . .
“PSA § 7.02 (lxiii): No predatory, abusive or deceptive lending practices, including but not limited to, the extension of credit to a Mortgagor without regard for the Mortgagor’s ability to repay the Revolving Credit Loan and the extension of credit to a Mortgagor which has no tangible net benefit to the Mortgagor, were employed in connection with the origination of the Revolving Credit Loan; . . .
“PSA § 7.02 (lxv): No Mortgagor was encouraged or required to select a Revolving Credit Loan product offered by [GreenPoint] which is a higher cost product designed for less creditworthy borrowers, unless at the time of the related Revolving Credit Loan’s origination, such Mortgagor did not qualify taking into account credit history and debt to income ratios for a lower cost credit product then offered by [GreenPoint] or any affiliate of [GreenPoint] . . . .”
In sum, the DBSP/ACE potential losses, if any, would “result from” both DBSP’s and/or ACE’s purported breaches of their representations and warranties to Assured and GreenPoint’s *739 purported breaches of its coextensive representations and warranties to DBS!] since the alleged circumstances and events constituting both purported breaches are the same. Consequently, GreenPoint’s contractual duty to indemnify DBSP for losses “resulting from” such breaches is “clearly implied in the language” of section 7.03 of the PSA even if the latter is “strictly construed.” (See § 7.03 of the PSA [covering losses “resulting from, a breach of (GreenPoint’s) representations and warranties (in the PSA)”].)
The cases cited by GreenPoint are not to the contrary. Taussig involved an agreement to pay a finder’s fee. (See Taussig, 13 AD3d 166 [2004].) “Finder” was a defined term in that agreement and encompassed only certain employees that also became limited partners in an entity called “Finders I.” (See id.) Construing the finder’s fee provision in the agreement strictly, the court held that plaintiff, Taussig, was not entitled to the finder’s fee because he was not a limited partner in Finders I.
The facts are distinguishable here. No matter how strictly the indemnification provision is construed, if certain allegations in Assured’s complaint are true, DBSP is entitled to indemnification from GreenPoint. As an example, in the complaint against DBSP and ACE, Assured alleges that the pool of HELOCs involved “pervasive violations of GreenPoint’s own underwriting guidelines and prudent mortgage-lending practices.” (See Potter aff, exhibit A 1i 44.) If this allegation is true, then Green-Point breached at least the following representations and warranties to DBSP: (1) “[t]he Origination and collection practices used by [GreenPoint] with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent, and customary in the mortgage origination and servicing industry”; and (2) “[t]he Revolving Credit Loan was underwritten in accordance with the Underwriting Guidelines of [GreenPoint] in effect at the time the Revolving Credit Loan was originated.” (See PSA § 7.02 [xxiii], [xxvii].) If DBSf] in turn, suffers a loss from any claim by Assured based on the allegation in question, then this would be a loss “resulting from [a] claim . . . resulting from, a breach of [GreenPoint’s] representations and warranties . . . .” (See PSA § 7.03 [emphasis supplied].) The fact that the same loss also can be causally and/or counterfactually traced to a breach of representations and warranties by DBSP does not sever the causal/counterfactual link to a breach of representations and warranties of GreenPoint because, as discussed, the two purported breaches involve the same circumstances and events.
*740 Sweeney and L. B. Smith are also inapposite. (See Sweeney v Hertz Corp., 292 AD2d 286 [1st Dept 2002]; L. B. Smith, Inc. v Bradley & Williams, 88 AD2d 782 [4th Dept 1982].) Both involve agreements “intended to exculpate a party from the consequences of his own negligence.” (See Sweeney, 292 AD2d at 288; L. B. Smith, 88 AD2d at 783.) The Court in Sweeney explained that the “law frowns upon [such] contracts . . . [and] subjects them] to close judicial scrutiny.” (See Sweeney, 292 AD2d at 288.) No such policy is at work here because the claims asserted against DBSP are for breach of contract.
Facilities Dev. is also distinguishable. (Facilities Dev. Corp. v Miletta, 180 AD2d 97 [3d Dept 1992].) The defendant in that case “Miletta, an engineer, [was hired] to design and supervise the rehabilitation of a heating plant at one of plaintiffs facilities.” (Id. at 99.) The third-party defendant, Mechanical Construction Corporation, was the general contractor of the rehabilitation project. (Id.) The indemnity clause in the agreement provided that “Mechanical will indemnify plaintiff, its representatives and certain others ‘from suits, actions, damages and costs of every nature and description resulting from the work under this [c]ontract.’ ” (Id. at 101.) Plaintiff asserted claims for malpractice and breach of contract against Miletta alleging “negligence in the design and specifications required by the parties’ contract.” (Id. at 102.) Miletta sought indemnification from Mechanical alleging that he was a representative of the plaintiff under the indemnity clause.
The court held that “an indemnification agreement between sophisticated business entities will be construed as intending to indemnify either party for its own wrongdoing only when the language in the agreement clearly connotes an intent to provide for such indemnification.'” (Facilities Dev., 180 AD2d at 102 [emphasis supplied], citing Fay’s Drug Co. v British Am. Dev. Corp., 140 AD2d 810, 811 [3d Dept 1988]; Lancaster Stone Prods. Corp. v Austin Powder Co., 112 AD2d 11, 12 [4th Dept 1985],)[13] The court found that “Miletta’s liability to plaintiff [was] limited to those damages caused by Miletta’s tortious *741 conduct in the rendition of professional engineering services (i.e., his malpractice) or Miletta’s breach of his contract with plaintiff.” (Id. at 102 [emphasis supplied].) The court ruled that “[t]he indemnity clause at issue d[id] not clearly connote an intent to provide for the indemnification of plaintiffs representative [Miletta] for damages caused by the representative’s [Miletta’s] own tortious conduct and/or breach of contract.” (Id.)
The facts are relevantly different here. Assured’s claims are premised on damages allegedly caused by “pervasive violations of GreenPoint’s own underwriting guidelines and prudent mortgage-lending practices” as well as other various alleged irregularities at the origination stage of the process. (See Potter aff, exhibit A 1f1f 43, 44 [emphasis supplied].) DBSP/ACE played no role at this stage of the securitization transaction. Their “wrongdoing,” if any, consisted in making certain representations and warranties about this stage to Assured.
DBSP’s and ACE’s representations and warranties, in turn, corresponded to coextensive representations and warranties that GreenPoint — the only party with direct knowledge of the origination process — made to DBSP (See Potter aff, exhibit D, §§ 7.01, 7.02.) An inference can therefore be drawn, especially in the context of a motion to dismiss, that DBSP/ACE were the information channels through which Assured, the recipient, learned about the origination process and the risk profile of HELOCs from GreenPoint, the source. Even if DBSP/ACE added misrepresentations in their role as information channels— thereby committing their own “wrongdoing” — their liability to Assured would not be “limited to . . . damages” flowing from these extra misrepresentations and warranties, but also from those made by GreenPoint. (Contrast with Facilities Dev., 180 AD2d at 102.) As to the latter, DBSP is entitled to indemnification.
Finally, the PSA contemplates that DBSP might sell the revolving credit loans in a mortgage-backed securities transaction to another buyer, and, thereby, replicate GreenPoint’s representations and warranties for the downstream buyer’s protection. (See Potter aff, exhibit D.) The indemnification provision of section 7.03 covers losses “based on or grounded upon, or resulting from, a breach of [GreenPoint’s] representations *742 and warranties.” “[Resulting from” is sufficiently expansive to cover losses suffered by DBSP as a result of the downstream effect of GreenPoint’s breaches of its representations and warranties in the PSA. In sum, in light of the clear language of the indemnification provision in the PSA, the nature of the representations and warranties at issue, and the structure and role of each party in the transaction, the court cannot hold that, as a matter of law, section 7.03 of the PSA does not “clearly connote an intent to provide for . . . indemnification” of DBSP’s breach of contract damages in this case. Consequently, GreenPoint’s motion to dismiss DBSP’s first cause of action for indemnification is denied.
C. Conditions Precedent
A complaint is properly dismissed where plaintiff fails to give “prompt written notice” of breach to defendant and where such notice is a condition precedent to defendant’s right to cure and plaintiff’s right to repayment under the parties’ agreement. (See ALJ Capital I, L.P. v David J. Joseph Co., 48 AD3d 208 [1st Dept 2008].) GreenPoint argues that section 7.03 requires, as a condition precedent to DBSP asserting a breach of representations and warranties cause of action against GreenPoint, that DBSP give GreenPoint notice as to which loans contain breaches of representations and warranties which materially and adversely affect the value of the loans. GreenPoint further argues that DBSP did not provide such notice. GreenPoint, therefore, contends that the breach of representations and warranties claims (the second and third causes of action) and the breach of the cure-or-repurchase protocol (the fourth cause of action) must be dismissed.
GreenPoint’s motion to dismiss the second, third, and fourth causes of action in the third-party complaint is denied because GreenPoint fails to establish that DBSP did not provide the requisite notice. On November 4, 2009, counsel for DBSP sent a letter to GreenPoint indicating that “DBSP has reviewed and discussed with [Assured] the notices and related exhibits sent by [Assured] notifying DBSP of alleged breaches of certain representations and warranties made by DBSP under the [HPA] with respect to Revolving Credit Loans identified on Schedule 1-A attached hereto (the ‘Breached Insurer Loans’).” (See KellyNajah aff, exhibit J, at 2.) Schedule 1-A identifies six revolving credit loans totaling $333,508.87. (See id.) The letter states that as to these six loans “DBSP and [Assured] have mutually agreed that . . . the alleged breaches of certain representations and *743 warranties made by DBSP under the [HPA] are valid breaches.” (Id. [emphasis supplied].)
Importantly, DBSP’s letter states that the breaches with respect to the breached insurer loans “constitute breaches of certain representations and warranties made by [GreenPoint] to DBSP under Section 7.02 of the [PSA] as restated in the Bring-down Letter.” (Id. [emphasis supplied].) It further states that “[p]ursuant to Section 7.03 of the [PSA] DBSP hereby notifies [GreenPoint] that [GreenPoint] has sixty (60) calendar days . . . following [its] receipt of this letter to cure such breaches or repurchase such revolving Credit loans and to indemnify DBSP . . . .” (Id. [emphasis supplied].)[14]
DBSP also alleges that GreenPoint has refused to cure the claimed breaches or repurchase any of the breached insurer loans. DBSP claims that prior to filing the third-party complaint, it reiterated its demand to GreenPoint in an August 24, 2010 letter but was similarly rebuffed. (See Kelly-Najah aff, exhibit A H1Í 15, 35; exhibit K.) In light of the documentary evidence submitted by DBSP and the factual allegations in Kelly-Najah’s affidavit, GreenPoint has not established that the conditions precedent of section 7.03 of the PSA, including notice, were not satisfied with respect to the breached insurer loans. (See Rovello, 40 NY2d at 635-636 [in assessing the motion, a court may freely consider affidavits submitted by the plaintiff to remedy any defects in the complaint].)
The total loan amount and number of the breached insurer loans does not change this result because there are no amount and/or number threshold requirements to section 7.03’s “accrual” provision. (See GreenPoint’s reply mem of law at 8.) Nor is the fact that DBSP did not “own” the loans at the time of notice a condition precedent to it asserting the relevant causes of action under section 7.03 of the PSA. (See id.) Section 7.03 provides that
“[a]ny cause of action against [Greenpoint] relating to or arising out of the breach of any representations and warranties . . . shall accrue as to any Revolving Credit Loan upon (i) discovery of such breach by [DBSP] . . . ; (ii) failure by [GreenPoint] to cure such breach or repurchase such Revolving *744 Credit Loan as specified above, and (iii) demand upon [Greenpoint] by [DBSP] for compliance with the relevant provisions of this Agreement.” (See Potter aff, exhibit D, § 7.03.)
GreenPoint fails to identify which, if any, of the conditions stated in section 7.03 are not met with respect to the breached insurer loans. The court already addressed discovery and notice by DBSP with respect to these loans. Further, GreenPoint does not allege that upon notice and within 60 days it “use[d] its best efforts promptly to cure such breachfes] in all material respects” or that the alleged breaches could not be cured.[15] The repurchase remedy is triggered only “if [the] breaches] cannot be cured.”[16] Additionally, the repurchase remedy is “at [DB-SP’s] option” and not a condition precedent to DBSP’s causes of action under section 7.03.[17] Even if it were, DBSP demanded repurchase and GreenPoint did not offer to comply, rendering DBSP’s failure to repurchase the loans from the Trust a nonissue in this case. Accordingly, it is ordered that GreenPoint’s motion to dismiss the third-party complaint is denied.

. Assured was formerly known as Financial Security Assurance Inc. (FSA). Though FSA was the signatory of the underlying contracts in this action, the court will refer to it under its new name, Assured, to avoid confusion.

. Assured also alleges that DBSP breached certain representations and warranties made by DBSP to ACE in the “HELOC Purchase Agreement” (the HPA) between DBSP and ACE, which were incorporated by reference for the benefit of Assured in the I&I. (See discussion, infra; Potter aff, exhibit F, § 2.01 [k].)

. The PSA identifies the loans purchased by DBSP as the “Revolving Credit Loans” which are listed in a “Revolving Credit Loan Schedule.” (See Potter aff, exhibit D, § 1.) The term “HELOC” is defined in appendix A of the “Indenture” agreement and refers to the loans that DBSP sold to ACE and ACE deposited in the Trust. (See Goldfarb aff, exhibits L, M and discussion, infra.) According to the third-party complaint, the HELOCs sold by DBSP are the same as the revolving credit loans purchased by DBSP from GreenPoint. (See Kelly-Najah aff, exhibit A tH 7, 8, 27, 28.) GreenPoint does not dispute this allegation.

. The Indenture agreement defines the “Cut-Off Date” as May 15, 2006. (See Goldfarb aff, exhibit M.)

. The I&I defines “Transaction Documents” as “[the I&I], the Indenture, the Trust Agreement, [the HPA], [the SSA], the Custodial Agreement, the Indemnification Agreement, the Administration Agreement and the Premium Letter.” (See Potter aff, exhibit F, appendix I.)

. The PSA contemplates that
“[f] olio wing its purchase of the Revolving Credit Loans-from the Seller, the Purchaser desires to sell some or all of the Revolving Credit Loans to one or more purchasers as a whole loan transfer in a whole loan or participation format or a public or private mortgage-backed securities transaction.” (See Potter aff, exhibit D.)

. The same letter notified GreenPoint of contingent claims with regard to additional loans (“Disputed Insurer Loans”), identified through an exhibit, for any breaches determined to be valid with respect to these loans. (See id.; *733 schedule 1-B.) In the letter DBSP explained that it had not agreed with Assured that the purported breaches for these loans were valid breaches. (Id.) According to DBSP, GreenPoint has refused to cure the alleged breaches or repurchase any of the disputed insurer loans.

. See Potter affidavit, exhibit A, paragraphs 36-37, for a list of the relevant representations and the discussion at pages 9-12, supra. I&I § 2.01 (j) incorporates these representations by reference because it provides that “the Offering Document does not contain any untrue statement of a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.” (See id.)

. The relevant representations and warranties by GreenPoint in the PSA include the following: PSA § 7.02 (i), (xxvii), (xxix), (xxxvii), (lxvi), (lii), (Ixiii).

. See Potter affidavit, exhibit A, paragraph 39 for the alleged representations by DBSP/ACE and the discussion at page 7, supra. I&I § 2.01 (q) provides that
“the information supplied by [DBSP and ACE] to S & P and Moody’s in connection with obtaining the respective ratings of the Securities did not contain any untrue statement of a material fact or omit to state any material fact required to be stated in order to make such information not misleading.”

. The relevant representations and warranties by GreenPoint in the PSA include the following: PSA § 7.02 (i), (xlix), (lii).

. Section 2.01 (k) of the I&I is a catch-all provision that incorporates by reference the representations and warranties made in the other transaction documents. It provides that
“[e]ach of the representations and warranties of [DBSP and ACE] contained in the Transaction Documents is true and correct in all material respects and [DBSP and ACE] hereby make[ ] each such representation and warranty to, and for the benefit of [Assured] as if the same were set forth in full herein . . . .”

. The court notes that like Sweeney — the First Department case cited above — the cases cited by the Court in Facilities Dev. apply the rule of construction for indemnity agreements only to negligence claims. (See Fay’s Drug Co. v British Am. Dev. Corp., 140 AD2d 810, 811 [1988]; Lancaster Stone Prods. Corp. v Austin Powder Co., 112 AD2d 11, 12 [1985].) Unlike negligence, breach of contract is not necessarily a “wrongdoing” to which the policy behind the rule applies. (See Oliver Wendell Holmes, The Common Law, at 235-236 [M. Howe (editor) 1963] [arguing that a contract is simply a set of *741 alternative promises either to perform or to pay damages for nonperformance].)

. As discussed the same letter notifies GreenPoint of contingent claims with regard to additional loans (“Disputed Insurer Loans”). (See id.; schedule 1-B.) The court need not reach the issue of whether the notice with respect to these loans was sufficient.

. Section 7.03 of the PSA provides that
“[w]ithin sixty (60) days . . . of . . . notice to [GreenPoint] of any breach of a representation or warranty which materially and adversely affects the value of a Revolving Credit Loan or the Revolving Credit Loans, [GreenPoint] shall use its best efforts promptly to cure such breach in all material respects.” (See Potter aff, exhibit D.)

. Section 7.03 of the PSA provides that “[i]f such breach cannot be cured, [GreenPoint] shall, at [DBSP’s] option, repurchase such Revolving Credit Loan at the Repurchase Price within two (2) Business Days following the expiration of the related cure period.” (See Potter aff, exhibit D [emphasis supplied].)

. See n 16, supra.