Bank of New York Mellon Trust v. Morgan Stanley Mortgage

In the

# United States Court of Appeals
## For the Second Circuit

August Term, 2015

(Argued: August 19, 2015    Decided: April 27, 2016)

Docket No. 14-2619-cv

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., Trustee for the
Registered Certificate Holders of Morgan Stanley Capital I Inc. Commercial
Mortgage Pass-Through Certificates Series 2007-IQ14, Acting by and Through
C-III Asset Management LLC, As Special Servicer,

*Plaintiff-Appellant,*

—v.—

MORGAN STANLEY MORTGAGE CAPITAL, INC.,

*Defendant-Appellee.*

Before:

CABRANES, RAGGI, and WESLEY, *Circuit Judges.*

1

On appeal from an award of summary judgment entered in favor of defendant Morgan Stanley Mortgage Capital, Inc. in the Southern District of New York (McMahon, *J.*), on a claim of breach of contract, plaintiff Bank of New York Mellon Trust Company, N.A. argues that the district court erred in (1) identifying a contractual duty to give "notice to cure" within three business days of becoming aware of a material breach as a condition precedent to defendant's remedy obligations; and (2) concluding, as a matter of law, that plaintiff's communication of notice of breach and request for cure was untimely, thereby absolving defendant of any obligation to repurchase without considering whether plaintiff's request demonstrated substantial performance.

VACATED AND REMANDED.

Judge WESLEY dissents in a separate opinion.

———————————

> DAVID A. BARRETT (Joshua J. Libling, *on the brief*), Boies, Schiller & Flexner LLP, New York, New York, *for Plaintiff-Appellant*.
>
> STEVEN G. KOBRE (Steven W. Perlstein, Josef M. Klazen, Lara Levinson, *on the brief*), Kobre & Kim LLP, New York, New York, *for Defendant-Appellee*.

———————————

REENA RAGGI, *Circuit Judge*:

In this breach-of-contract action, plaintiff Bank of New York Mellon Trust Company, N.A. ("BNY" or "Trustee") appeals an award of summary judgment in favor of defendant Morgan Stanley Mortgage Capital, Inc. ("Morgan Stanley") entered on June 17, 2014, in the United States District Court for the Southern District of New York (Colleen McMahon, *Judge*).  BNY argues that the district court erred in concluding, as a matter of law, that Morgan Stanley was not contractually obliged to repurchase a mortgage loan allegedly issued in breach of a contract representation because (1) the Trustee's duty to give "notice to cure" within three business days of becoming aware of a material breach was a condition precedent to the seller's repurchase obligation, Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc., No. 11 Civ. 0505 (CM) (GWG) ("BNY I"), 2013 WL 3146824 (S.D.N.Y. June 19, 2013); and (2) that condition was not performed within the specified three days, but two to four weeks later, see Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc., No. 11 Civ. 0505 (CM) (GWG) ("BNY II"), 2014 WL 2745011 (S.D.N.Y. June 16, 2014).

For reasons explained herein, we conclude that the contract at issue did not require notice to cure as a condition precedent to Morgan Stanley remedying breach. Indeed, the phrase "notice to cure" does not appear in the contract. Rather, the contract contains distinct provisions for giving <u>notice of breach</u> and making <u>request for cure</u>, neither of which is cast in the express language of condition. To the extent a condition precedent might be inferred from the fact that notice of breach is a necessary trigger for the 90-day cure period, that rationale would pertain only to the giving of that notice, not to its timeliness, and much less to request for cure, which performs no triggering role. Thus, request for cure is not a condition precedent to Morgan Stanley's remedy obligations, and the timeliness of a request for cure, as well as of a notice of breach, is properly construed as a promise and reviewed for substantial performance.

On review of the record, we further conclude that the notice of breach and request for cure in this case cannot be held untimely as a matter of law, particularly when reviewed for substantial performance. Accordingly, we vacate the award of summary judgment in favor of Morgan Stanley, and we remand the case to the district court for further proceedings consistent with this opinion.

4

## I.   Background

### A.   The Mortgage Loan Purchase Agreement

The contract at issue is a May 1, 2007 Mortgage Loan Purchase Agreement ("MLPA"), pertaining to an $81 million mortgage loan that Morgan Stanley issued to City View Center, LLC (the "City View Loan") on December 29, 2006, for the purchase of a retail center in Garfield Heights, Ohio (the "City View Property").  Pursuant to the MLPA, Morgan Stanley sold the City View Loan to Morgan Stanley Capital I, Inc., which, pursuant to a Pooling and Servicing Agreement ("PSA") of the same date, placed the City View Loan into Morgan Stanley Capital I Trust 2007-IQ14 (the "Trust"), then valued at nearly five billion dollars.  The Trust was later securitized and sold to investors.

The PSA designated BNY as trustee of the Trust and, thus, the entity entitled to enforce various agreements, including the MLPA here at issue.  The PSA also designated Wells Fargo National Association ("Wells Fargo") as a Master Servicer, responsible for administering the Trust's loans and collecting payments, and Centerline Servicing Inc. ("Centerline") as Special Servicer,

responsible for servicing any defaulted loans.[1]  On May 30, 2007, Trustee BNY granted the Master and Special Servicers authority to act on its behalf when servicing and administering the Trust's loans.

B.      City View's Default on the Loan

On September 9, 2008, Master Servicer Wells Fargo informed Special Servicer Centerline that the City View Loan would likely go into default within 60 days because (1) City View had received numerous notices of lease default from Wal-Mart, the anchor tenant of the City View Property, based on methane gas intrusion into the store; (2) the Ohio Attorney General had filed a complaint against City View (and others) for regulatory violations on the City View Property, including the failure to control the migration of combustible gases; and (3) the Ohio Agency for Toxic Substances & Disease Registry had determined that conditions at the City View Property amounted to an urgent public hazard. On September 15, 2008, Wal-Mart in fact closed its City View Property store and,

---

[1] On May 10, 2010, pursuant to transactions not relevant here, C-III Asset Management LLC replaced Centerline as the Trust's Special Servicer.  For purposes of this appeal, we need only refer herein to the "Special Servicer," without regard to the specific entity then serving in that capacity.

soon after, canceled its lease. On November 8, 2008, City View defaulted on a mortgage-loan payment. Four days later, Wells Fargo transferred the City View Loan to Centerline for special servicing.

C.   Notice of Breach and Request for Cure

Upon transfer, Centerline's Director of Special Servicing, Jennifer Wilkicki, began investigating Morgan Stanley's possible breach of the MLPA.[2] On February 16, 2009, Wilkicki sent a document captioned "Representation and Warranty Claim" to Centerline's Associate General Counsel, Jenna Unell. That four-page document appears to be a draft notice of breach to the Seller in that its opening sentence states as follows: "The Special Servicer believes it has discovered a Material Breach of the Seller's Representations and Warranties and hereby provides notice as required by the governing Pooling and Servicing

---

[2] As the district court detailed, Wilkicki was not then totally unfamiliar with the City View Loan. Prior to securitization, Centerline (and its predecessor) had acted as Interim Servicer at Morgan Stanley's behest. Centerline's parent company was then evaluating whether to invest in the Trust, and Wilkicki was among the Centerline employees who conducted due diligence. See BNY I, 2013 WL 3146824, at *3, *25. The district court explained why the Trustee cannot be charged with knowledge obtained by Centerline when not acting on its behalf, see id. at *25–29, and the parties do not argue otherwise on this appeal. Thus, we do not discuss that further.

Agreement." J.A. 896. The document proceeds to identify "Representation/Warranty (12)" as the provision breached insofar as Morgan Stanley had represented that it had "no knowledge of any material and adverse environmental condition or circumstance" affecting the City View Property not disclosed in a referenced Environmental Report when it had, in fact, learned otherwise. Id. (internal quotation marks omitted).[3] The document supports this conclusion by citing Morgan Stanley's January 5, 2007 Closing Counsel Transaction Summary, which acknowledged the Environmental Report's failure

---

[3] Representation 12 is entitled "Environmental Conditions" and states as follows:

(i) With respect to the Mortgaged Properties securing the Mortgage Loans . . . an environmental site assessment, or an update of a previous such report, was performed with respect to each Mortgaged Property in connection with the origination or the acquisition of the related Mortgage Loan, a report of each such assessment (or the most recent assessment with respect to each Mortgaged Property) (an "Environmental Report") has been delivered to the Purchaser, and the Seller has no knowledge of any material and adverse environmental condition or circumstance affecting any Mortgaged Property that was not disclosed in such report.

J.A. 473 (emphasis in original).

8

to address the fact that the City View Property was subject to state regulation as a "closed land fill" and that the property had received "numerous 'notices of violation' issued by the Ohio Environmental Protection Agency." Id.[4] The document also details "additional facts . . . to demonstrate the material and adverse effect" the noticed breach had on "the interests of the holders of the Certificates in the Mortgage Loan." Id.; see id. at 897–98. Among these were Wal-Mart's departure from the City View Property and its cessation of rent payments, as a result of which other tenants exercised co-tenancy clauses resulting in terminated leases, reduced rents, or discontinued rent payments. The document also explains that this left City View with insufficient operating income, causing it to discontinue loan payments to the Trust, which now faced the legal expenses of petitioning "the federal court to place a receiver at the property," proceeding against defaulting tenants, and appealing the rejection of City View's insurance claim. Id. at 898. Attributing the catalogued adverse effects to Morgan Stanley's breach of Representation 12, the document

---

[4] On this appeal, we express no view as to the merits of the Servicer's (and, therefore, Trustee BNY's) breach conclusion. We consider only whether BNY failed to satisfy an MLPA condition precedent for securing a remedy for breach.

concluded, "[t]he Mortgage Loan should be repurchased pursuant to the terms and conditions set forth in the PSA and the applicable MLPA." Id.

Three days later, on February 19, 2009, Unell advised Wilkicki that she had reviewed pertinent materials and agreed "that there [was] evidence that [Morgan Stanley] knew that there were material environmental conditions or circumstances affecting the Property that were not disclosed in the Phase I report." Id. at 1266. Unell asked Wilkicki to call her "to discuss further," concluding, "I think that the breach notice should be sent." Id.

A breach notice was sent approximately one month later, on March 18, 2009. In the interim, Wilkicki secured an appraisal, which on February 27, 2009, valued the City View Property at $22.3 million, a steep decline from the $103.4 million appraisal of two years earlier. Another appraisal, confirming the $22.3 million valuation, was received on March 13, 2009.

Between receipt of these two appraisals, on March 3, 2009, Wilkicki sent Unell a more formally worded draft breach notice and request for cure, and solicited her comments. On March 13, Unell emailed Wilkicki her edits to the draft notice. The next day, Wilkicki sent the revised draft to her supervisor,

10

Chris Crouch, who approved it on March 16 and directed Wilkicki to send it on to Centerline's President, Paul Smyth, "for go ahead to release." Id. at 1347. After receiving Smyth's authorization for release, Wilkicki sent Morgan Stanley a formal notice of breach and request for cure on March 18, 2009. Tracking language in the MLPA and PSA, the notice stated that if the material breach were not corrected or cured within 90 days of receipt, Morgan Stanley would be contractually obligated to repurchase or to replace the City View Loan. It is, in fact, undisputed on this appeal that the breach was one that could not be cured.

Approximately two months later, by letter dated May 11, 2009, Morgan Stanley replied that it disagreed with Centerline's "characterization of the facts and circumstances" and "intend[ed] to vigorously defend its underwriting and disclosures made in the PSA and the Mortgage Loan." Id. at 1093. Thus, it did not repurchase or replace the City View Loan.

On September 24, 2010, the Special Servicer sent Morgan Stanley a "Second and Supplemental Notification of Material Breach." In addition to alleging more facts to support the earlier noticed breach of Representation 12, it asserted a

breach of Representation 27, the MLPA's No Material Default Representation.[5]

In its December 22, 2010 reply, Morgan Stanley reiterated its intent to defend its

representations, and asserted that the Special Servicer's March 18, 2009 and

September 24, 2010 letters were, in any event, deficient because they

"constitute[d] late notice." Id. at 1096.

D.    District Court Proceedings

On January 25, 2011, BNY filed this lawsuit against Morgan Stanley for

breach of the MLPA.  Following amended pleadings and discovery, both parties

moved for summary judgment.  On June 19, 2013, the district court granted

Morgan Stanley partial summary judgment on BNY's breach claim as to the No

---

[5] In Representation 27, Morgan Stanley warrantied that, to its knowledge, there was "no material default, breach, violation or event of acceleration (and no event which, with the passage of time or the giving of notice, or both, would constitute any of the foregoing) under the documents evidencing or securing the Mortgage Loan" that would materially and adversely affect the value of the mortgage loan or property.  J.A. 478–79.  The Special Servicer asserted that Morgan Stanley breached this representation because, by December 2006, at the latest, it knew that Wal-Mart was claiming lease default, and yet Morgan Stanley represented in May 2007 that there was no material default underlying the City View Loan.  See id. at 781–82.

12

Material Default Representation provision.[6]  That ruling is not at issue on this appeal.  As to the claimed breach of the Environmental Conditions Representation, the district court granted BNY summary judgment on Morgan Stanley's waiver defense, but concluded that "many issues of disputed fact" precluded a general award in favor of BNY.  BNY I, 2013 WL 3146824, at *30. Although the district court agreed with Morgan Stanley that timely "notice to cure" was a "condition precedent" to any buyback obligation for breach of the Environmental Conditions Representation, it decided that further discovery was needed to determine when the Special Servicer became aware of that alleged breach.  Id. at *16–17; see id. at *19–22.

After discovery closed, the district court determined, as a matter of law, that BNY's "Special Servicer became aware of a material breach of the Environmental Representation more than three business days before March 18, 2009," making its breach notice on that date untimely, thereby failing to satisfy

---

[6] The district court concluded that the Special Servicer had possession of all facts necessary to investigate and bring a claim for breach of this representation by March 16, 2009, making its September 24, 2010 notice of breach untimely.  See BNY I, 2013 WL 3146824, at *23.  This conclusion is not challenged on appeal and, thus, we do not discuss it further.

that condition precedent to Morgan Stanley's repurchase obligation.  BNY II, 2014 WL 2745011, at *7–9.  Accordingly, on June 17, 2014, the district court entered summary judgment in favor of Morgan Stanley on the Environmental Representation breach claim.

This timely appeal followed.

## II.    Discussion

This appeal presents two questions for de novo review:  (1) whether the MLPA's request-for-cure obligation is a condition precedent that must be timely performed by the Servicer before Morgan Stanley has any obligation to cure or to repurchase a noticed defective loan; and (2) whether it can be determined as a matter of law on the existing record that the request for cure in this case was untimely.  See Lynch v. City of New York, 737 F.3d 150, 156 (2d Cir. 2013) (reviewing award of summary judgment de novo and upholding only if "there is no genuine issue of material fact" and "moving party is entitled to judgment as a matter of law"); Phillips v. Audio Active Ltd., 494 F.3d 378, 384 (2d Cir. 2007) (interpreting contract de novo).  We answer both questions in the negative and, therefore, vacate the award of summary judgment in favor of Morgan Stanley

14

and remand the case to the district court for further proceedings consistent with this opinion.

### A. MLPA Section 5's Remedies Provision

The district court derived the condition precedent it identified—an obligation to give "notice to cure" within three business days of the Servicer becoming aware of a material breach—from MLPA Section 5, titled "Remedies Upon Breach of Representations and Warranties Made by the Seller." Thus, we begin by examining the relevant text, which states as follows:

> [I]f there is a breach of any of the representations and warranties required to be made by the Seller regarding the characteristics of the Mortgage Loans and/or the related Mortgaged Properties . . . and . . . [such] breach, either (i) materially and adversely affects the interests of the holders of the Certificates in the related Mortgage Loan, or (ii) both (A) the . . . breach materially and adversely affects the value of the Mortgage Loan and (B) the Mortgage Loan is a Specially Serviced Mortgage Loan . . ., **[1]** the party discovering such . . . Material Breach shall promptly notify, in writing, the other party . . . . **[2]** Promptly (but in any event within three Business Days) upon becoming aware of any such . . . Material Breach, the Master Servicer shall, and the Special Servicer may, request that the Seller, not later than 90 days from the Seller's receipt of the notice of such . . . Material Breach, cure such . . . Material Breach . . . .
>
> **[3]** The Seller hereby covenants and agrees that, if any such . . . Material Breach cannot be corrected or cured in all material aspects within the above cure period[], the Seller shall, on or before the

15

termination of such cure period[], either (i) repurchase the affected Mortgage Loan . . . from the Purchaser or its assignee at the Purchase Price as defined in the Pooling and Servicing Agreement, or (ii) if within the two-year period commencing on the Closing Date, at its option replace, without recourse, any Mortgage Loan . . . to which such defect relates with a Qualifying Substitute Mortgage Loan.  If such . . . Material Breach would cause the Mortgage Loan to be other than a "qualified mortgage" (as defined in the Code), then notwithstanding the previous sentence, such repurchase or substitution must occur within 90 days from the earlier of the date the Seller discovered or was notified of the breach or defect.

J.A. 454–55 (emphasis added).[7]

In fact, the quoted language identifies three obligations (corresponding to the inserted highlighted numbers).  First, a notice-of-breach obligation, which requires any party—whether the Trustee, Master Servicer, Special Servicer, or even the Seller—"discovering" a material breach of representation promptly to notify the other party of its discovery of such breach.  Second, a request-for-cure obligation, which requires the Master Servicer, and permits the Special Servicer,

---

[7] Section 2.3(a) of the PSA contains similar, but not identical, breach and recourse language.  See J.A. 121–22.  The district court focused on the language in the MLPA as it was the only contract to which Morgan Stanley was a party.  As neither party challenges that approach on appeal, we do the same without considering any language discrepancies between the MLPA and the PSA.

16

promptly, but in any event within three business days of "becoming aware" of the material breach, to request that the Seller cure breach within 90 days of the receipt of notice. Third, a cure-or-repurchase obligation, which requires the Seller either (a) to cure the material breach within 90 days of receiving notice, or (b) if the breach cannot be cured, to repurchase or to replace the defective mortgage loan.

As this parsing demonstrates, Section 5 nowhere references "notice to cure." We understand the district court to have used that phrase as a shorthand reference for both the notice-of-breach and request-for-cure obligations, concluding that where, as in this case, the Servicer is the party "discovering" the material breach, it can be said to have become "aware" of the breach (triggering its request-for-cure obligation) at the same time it "discovered" it (triggering its notice-of-breach obligation). See BNY I, 2013 WL 3146824, at *20. As we explain in the next section of this opinion, that reasoning is not without some force in explaining how a common trigger date applies to these two MLPA obligations in the circumstances of this case. See infra pp. 30–32. But, it does not support merging the provisions for purposes of condition-precedent review. Indeed,

17

Morgan Stanley defends the district court's identification of a condition precedent only by reference to the request-for-cure obligation. Accordingly, we here decide whether request for cure is a condition precedent to Morgan Stanley's obligation to cure or repurchase.

B. Request for Cure Is Not a Condition Precedent to Cure or Repurchase

Under New York law, which controls our construction of the MLPA, a condition precedent is "an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 690, 636 N.Y.S.2d 734, 737 (1995) (internal quotation marks omitted). Conditions precedent are not readily assumed. While specific, talismanic words are not required, the law nevertheless demands that conditions precedent be "'expressed in unmistakable language.'" Id. at 691, 636 N.Y.S.2d at 737 (quoting Restatement (Second) of Contracts § 229, cmt. a, at 185). Thus, "[i]n determining whether a particular agreement makes an event a condition[,] courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition." Id.; see Unigard Sec. Ins. Co. v. N. River Ins.

18

Co., 79 N.Y.2d 576, 581, 584 N.Y.S.2d 290, 292 (1992); see also Israel v. Chabra, 537 F.3d 86, 93 (2d Cir. 2008) (citing Oppenheimer in acknowledging New York courts' caution when interpreting contract clause as condition precedent). Applying these principles here, we conclude that, under the MLPA, the Servicer's obligation to request cure within three business days of becoming aware of a material breach is not unmistakably cast as a condition precedent to Morgan Stanley's cure-or-repurchase obligation, and, therefore, must be construed as a promise.

Certainly, the MLPA does not caption or otherwise label the request-for-cure provision as a "condition precedent" to Section 5 remedies, as one might expect sophisticated parties to do if that were their intent. See, e.g., Lindenbaum v. Royco Prop. Corp., 165 A.D.2d 254, 259, 567 N.Y.S.2d 218, 220 (1st Dep't 1991) (concluding that contract clearly imposed condition precedent where, under heading "Conditions of Loan Approval," parties expressly noted that certain "conditions must be satisfied prior to the issuance of Closing Instructions" (emphasis omitted)).

Nor does MLPA Section 5 employ any recognized "linguistic conventions" of condition—such as "'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to,'"—to make plain that Morgan Stanley's remedy obligations do not arise unless and until the Servicer requests cure. Israel v. Chabra, 537 F.3d at 93 (quoting Ginett v. Comput. Task Grp., 962 F.2d 1085, 1100 (2d Cir. 1992)) (identifying notice obligation introduced by underscored phrase "provided, however," as condition precedent to immediately preceding guaranties); see Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d at 691, 636 N.Y.S.2d at 737 (recognizing "if" and "unless and until" as "unmistakable language of condition").

The failure to couch the request-for-cure provision in the explicit language of condition is particularly significant here because the sophisticated drafters elsewhere employed precisely such language to establish undoubted conditions precedent. See, e.g., J.A. 448 (providing in MLPA for certain actions "in the event that . . . the Mortgage Loans . . . are held to be the property of the Seller" (emphasis added)); id. at 450 (providing in MLPA for agent or designee to exercise purchaser's rights "provided the Purchaser has provided the Seller with

prior notice of the identity of such designee or agent" (emphasis added)); see also id. at 264 (stating in PSA that "successor master servicer must assume all of the obligations of the terminated Master Servicer . . . as a condition precedent to its becoming Master Servicer hereunder" (emphasis added)); id. at 341 (stating in PSA that, "as a condition precedent to the indemnification provided for in this Section," indemnitee must "notify the applicable Indemnifying Party in writing" of commencement of any action (emphasis added)).[8]

Indeed, even within MLPA Section 5, its drafters employed the unmistakable language of condition in detailing Morgan Stanley's repurchase obligation. See id. at 455 (stating that Seller "covenants and agrees that, if any

---

[8] There is no indication that BNY played any part in drafting the MLPA. Rather, Morgan Stanley appears to have drafted this document, as the same Morgan Stanley Vice President signed the agreement on behalf of both Morgan Stanley and Morgan Stanley Capital I, Inc., the sole contracting parties. See J.A. 465. While BNY, as the named Trustee, is a party to the PSA, there is no indication in the record as to its role in drafting that agreement. In any event, because the point is not raised, we have no occasion to consider whether any ambiguities in MLPA provisions are properly construed against Morgan Stanley as drafter. See Village of Ilion v. County of Herkimer, 23 N.Y.3d 812, 820, 993 N.Y.S.2d 648, 652 (2014). It suffices that the law requires ambiguous provisions to be construed as promises rather than conditions precedent. See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d at 691, 636 N.Y.S.2d at 737.

21

such . . . Material Breach cannot be corrected or cured in all material aspects within the [90-day] cure period[], the Seller shall . . . either (i) repurchase the affected Mortgage Loan . . . or (ii) . . . replace, without recourse, any Mortgage Loan" (emphasis added)). In short, Section 5 makes plain that Morgan Stanley is required to repurchase or replace a defective loan only if it is unable to cure the defective representation within the 90-day period afforded by the MLPA. There is no comparable contract language, however, that conditions this remedy obligation on a request for cure, much less on such a request being made within three business days. See Realtime Data, LLC v. Melone, 104 A.D.3d 748, 750–51, 961 N.Y.S.2d 275, 277–78 (2d Dep't 2013) (invoking canon expressio unius est exclusio alterius to conclude that contract language conditioning employee bonus "upon" sale of assets implies that bonus does not apply to distributions otherwise based); see also International Fid. Ins. Co. v. County of Rockland, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000) (recognizing that "[s]ophisticated lawyers . . . must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning").

22

Thus, the very contract language employed by the parties undermines our dissenting colleague's conclusion that Morgan Stanley cannot be expected to cure breaches of which it has been notified but for which it has not received a formal request for cure. See Dissenting Op., post at 4–8. In fact, its obligation to repurchase is conditioned only on its inability to cure within the 90-day cure period. And, as the MLPA makes clear, that cure period is triggered exclusively by "the Seller's receipt of the notice of . . . Material Breach," not the Servicer's request for cure. J.A. 454 (emphasis added).

While New York courts have construed some triggering events as conditions precedent, they have done so only when the trigger is necessary to a party's ability to perform the obligation at issue. See, e.g., ALJ Capital I, L.P. v. David J. Joseph Co., 15 Misc. 3d 1127(A), 2007 WL 1218355, at *2, *5 (Sup. Ct. Mar. 13, 2007) (holding notice of disallowance a condition precedent to defendant's repayment obligation because notice was necessary to afford defendant opportunity to cure disallowance within cure period, upon failure of which plaintiff could demand repayment), aff'd 48 A.D.3d 208, 208, 851 N.Y.S.2d 154, 155 (1st Dep't 2008); see also Assured Guar. Mun. Corp. v. DB Structured

23

<u>Prods., Inc.</u>, 33 Misc. 3d 720, 731, 742–44, 927 N.Y.S.2d 880, 887–88, 895–97 (Sup. Ct. July 25, 2011) (assuming that notice of breach triggering 60-day cure period was condition precedent to repurchase obligation in holding notice adequate); <u>Morgan Guar. Tr. Co. v. Bay View Franchise Mortg. Acceptance Co.</u>, No. 00 Civ. 8613 (SAS), 2002 WL 818082, at *4–5 (S.D.N.Y. Apr. 30, 2002) (applying New York law in recognizing request to cure as condition precedent where it was exclusive trigger for 30-day cure period, which, if not met, gave rise to repurchase obligation).

Even if the MLPA's notice-of-breach provision might be construed as a condition precedent because it is the necessary trigger for the cure period afforded Morgan Stanley,[9] its request-for-cure provision serves no comparable essential function without which Morgan Stanley could not understand or perform its cure obligation. Because we are not free to "rewrite into a contract conditions the parties did not insert by adding or excising terms under

_____

[9] We need not decide this question because, as earlier noted, Morgan Stanley defends the district court's judgment only by reference to the contract's request-for-cure obligation.

24

the guise of construction," <u>Slamow v. Del Col</u>, 174 A.D.2d 725, 726, 571 N.Y.S.2d 335, 336 (2d Dep't 1991), we here conclude simply that whatever triggering rationale might apply to notice of breach, it does not extend to request for cure. The plain language of the MLPA obligates Morgan Stanley to cure or to repurchase a noticed defective loan within 90 days of the receipt of a notice of breach. The obligation makes no mention of receipt of a request for cure.[10]

---

[10] Judge Wesley deems it implausible that Morgan Stanley would be obligated to cure in the absence of a request. He maintains that because the Special Servicer was under no obligation to request cure, its request for cure provided essential signaling and demand functions. <u>See</u> Dissenting Op., <u>post</u> at 4–7, 7 n.4. The conclusion is undermined not only by the MLPA's express assignment of the signaling function to notice of breach, but also to its assignment of a mandatory request-for-cure obligation to the Master Servicer. <u>See</u> J.A. 454 (explaining that, upon becoming aware of any material breach, Master Servicer must, and Special Servicer may, request cure). We need not parse the difference between the Master Servicer's and the Special Servicer's request-for-cure obligations further because, in any event, the MLPA has not unequivocally identified request for cure as a condition precedent. Thus, in the situation here, where Morgan Stanley is alleged to have breached its cure-or-repurchase obligation <u>and</u> the Servicer is alleged to have breached its obligation to request cure within three days, the law considers two broken promises (three, when one considers Morgan Stanley's alleged breach of Representation 12) and compensates the parties accordingly, taking into account, among other things, the issue of substantial performance. <u>See, e.g.</u>, <u>Schwartz v. Pierce</u>, 57 A.D.3d 1348, 1350–51, 870 N.Y.S.2d 161, 163–65 (3d Dep't 2008) (affirming damages award where jury found both parties to be in breach of contract).

25

Thus, when the district court held that "sending a <u>notice to cure</u> is unmistakably required to trigger the cure period and the buyback obligation," <u>BNY I</u>, 2013 WL 3146824, at *17 (emphasis added), it could only have been referring to the MLPA's <u>notice-of-breach</u> obligation, the exclusive trigger for the 90-day period. That same conclusion pertains to the district court's statement that, because the MLPA's repurchase provision "expressly refers back to the notice to cure," Morgan Stanley's obligation to repurchase is "dependent on that notice." <u>Id.</u> (alteration and internal quotation marks omitted). What the repurchase provision expressly refers back to is "the date the Seller discovered or was notified of the breach or defect," J.A. 455; it nowhere mentions "notice to cure." The district court went on, however, to conclude that "notice to cure" was a condition precedent that had to be performed within three business days: "The notice to cure is a condition precedent to the repurchase obligation, and the parties plainly bargained for the 'three day' provision in the contract." <u>BNY I</u>, 2013 WL 3146824, at *21. We disagree. Even if the first part of the quoted sentence might find support in the MLPA's notice-of-breach obligation, the parties did not plainly bargain to subject notice of breach to the three-day

26

limitation applicable only to request for cure. Indeed, when it recited that "[t]he MLPA gave the Special Servicer three days to send out notice of any breach," BNY II, 2014 WL 2745011, at *3, the district court misstated the contract.

In sum, because (1) the obligation to request cure within three business days is neither framed in conditional language nor a necessary trigger for Morgan Stanley's remedy obligations; (2) notice of breach is, in fact, the exclusive trigger for the 90-day period within which Morgan Stanley was obligated to cure or to repurchase; and (3) the timeliness of notice of breach is not contractually limited to three days, we conclude that the MLPA cannot be construed to make either notice of breach within three business days or request for cure conditions precedent to Morgan Stanley's remedy obligations. See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d at 691, 636 N.Y.S.2d at 737. Rather, timely request for cure is properly construed as a promise, which on remand should be reviewed only for substantial performance. See Israel v. Chabra, 537 F.3d at 93.

C.   The Timing of the Servicer's Request for Cure Cannot Preclude a Finding of Substantial Performance as a Matter of Law

The district court determined, as a matter of law, that the Servicer's March 18, 2009 communication to Morgan Stanley of notice of breach and request for cure was untimely.  See BNY II, 2014 WL 2745011, at *9.  We here conclude that the timing of the Servicer's request for cure cannot preclude a finding of substantial performance as a matter of law.  In explaining this conclusion, we first examine the reasoning informing the district court's timeliness analysis, some of which we accept, but other parts of which are at odds with the plain language of the MLPA.

As already detailed, the MLPA requires a party to give notice of breach promptly upon discovering a material breach of representation.  It also requires a Servicer to act promptly in requesting cure after becoming aware of the breach.  But it is only as to the latter obligation that the MLPA cabins promptness to three business days.  The district court, however, appears to have concluded that where, as here, the Servicer is the discovering party, notice of breach is not prompt if not made within three days.  See id. at *3 ("The MLPA gave the Special Servicer three days to send out notice of any breach."); id. at *9 (holding that,

28

because Servicer's notice to Morgan Stanley was not sent within three business days of what court found to be "absolute, drop-dead date" for awareness of breach, "breach notice was therefore untimely"). In view of the Servicer's having discovered the breach, the district court concluded that (1) any difference in the obligations' triggering words—"discovering," and "becoming aware of"—was "of no moment," BNY I, 2013 WL 3146824, at *20; (2) awareness, like discovery, occurs only at the conclusion of an investigation of the suspected breach, provided the investigation is concluded within a reasonable time, see id. at *19–21; (3) the Servicer had reasonably concluded its investigation and, thus, become "aware" of Morgan Stanley's alleged breach (a) by "February 16, when Wilkicki prepared her memorandum" to Unell, or certainly (b) "by February 19, when Unell agreed with Wilkicki's assessment and instructed her to send the breach notice," but in no event later than (c) "February 27, when the draft appraisal came in," BNY II, 2014 WL 2745011, at *9. Thus, the Servicer's delay of some two weeks after the last of these dates to transmit a request for cure was held untimely as a matter of law.

BNY faults this reasoning on several grounds. We focus here on the argument it derives from the well established principle that, where contract provisions use different language, courts must assume the parties intended different meanings. See Frank B. Hall & Co. of N.Y. v. Orient Overseas Assocs., 48 N.Y.2d 958, 959, 425 N.Y.S.2d 66, 67 (1979). Thus, BNY argues, "discovering" breach must mean something different from "becoming aware" of breach, with "awareness" necessarily coming after "discovery"—indeed, after communication of the notice of breach triggered by discovery—to avoid the absurdity of requiring a Servicer to request cure (within three business days of awareness) before requiring the party discovering the breach to give notice (subject to an undefined promptness obligation), thereby triggering the cure period.

BNY's argument makes sense when the Servicer is not the party discovering the breach. In that circumstance, it will generally only be upon receipt of the discoverer's notice of breach that the Servicer acquires the awareness necessary for it to request cure. Further, to the extent the discoverer conducted an investigation of the breach that the Servicer has no need to

30

duplicate, the latter can reasonably be expected to make its request for cure within three business days of receiving the notice of breach.

But, when the Servicer is the party discovering breach, we cannot categorically conclude, as BNY urges, that it does not become aware of the breach until it transmits its own notice of breach to others. Dictionary definitions may admit the possibility of discovery without awareness. <u>Compare</u> <u>Webster's Third New Int'l Dictionary</u> 656 (2002) (defining "discover" as "to obtain for the first time sight or knowledge of" or "to detect the presence of"), <u>with</u> <u>id.</u> at 152 (defining "aware" as "marked by realization, perception, or knowledge").[11] The conclusion, however, does not transfer here, where, as the district court correctly observed, the law charges a party with discovery of breach only after it has had a reasonable opportunity to investigate and confirm its suspicions—in short, when it effectively becomes aware, rather than simply suspicious, of breach. The reason the law thus delays discovery of a breach is to avoid creating an incentive for litigation before a party knows that it has suffered injury. <u>See</u> <u>BNY I</u>, 2013

---

[11] Thus, Columbus can be said to have discovered the Americas without being aware that they were new continents, while Vespucci can be said to have been aware that the Americas were new continents without having discovered them.

31

WL 3146824, at *19 (collecting cases); id. at *21 (acknowledging that, in complex circumstances, confirming investigation can take several months).

We therefore decline to hold as a matter of law that a Servicer who discovers a breach cannot be charged with awareness until it transmits notice. The fact that the Servicer in this case simultaneously transmitted its request for cure with its notice of breach does not necessarily mean that the former was filed within the requisite three business days. Rather, the timeliness of both notice of breach and request for cure may depend, as the district court recognized, on whether they were sent promptly after the Special Servicer reasonably concluded its investigation of breach.

Where we depart from the district court is in its conclusion that notice of breach, as well as request for cure, had to be communicated within three business days to be deemed prompt. As already discussed, the MLPA imposes a three-day limitation on the word "promptly" only as to requests for cure. The absence of such a limitation from the notice-of-breach obligation indicates that the word is to be construed more flexibly in light of the totality of circumstances. See United States Fid. & Guar. Co. v. Annunziata, 67 N.Y.2d 229, 233, 501

32

N.Y.S.2d 790, 792 (1986) (recognizing that where condition included in one provision is omitted from another, it "must be assumed to have been intentional under accepted canons of contract construction"); Sterling Inv'r Servs., Inc. v. 1155 Nobo Assocs., LLC, 30 A.D.3d 579, 581, 818 N.Y.S.2d 513, 516 (2d Dep't 2006) (same).

We further conclude that the district court could not identify the reasonable conclusion date for the Special Servicer's breach investigation—or even three possible conclusion dates—as a matter of law. Where the promptness of breach discovery is questioned, resolution depends on an assessment of the totality of circumstances, necessarily including the credibility of witnesses and the weight particular evidence will bear. Such matters are generally determined by the trier of fact rather than the court, particularly when the ultimate question is reasonableness. See Hartford Ins. Co. v. County of Nassau, 46 N.Y.2d 1028, 1030, 416 N.Y.S.2d 539, 541 (1979) (noting that "question whether a notice . . . has been sent 'as soon as is reasonably possible' is a question of fact which depends on all the facts and circumstances, especially the length of and the reasons for the delay," and that "[i]t is only in the exceptional case that it may be decided as a

matter of law"); <u>Deso v. London & Lancashire Indem. Co. of Am.</u>, 3 N.Y.2d 127, 129, 164 N.Y.S.2d 689, 691 (1957) (explaining that "reasonableness of a delay" in timely written notice is usually question for jury); <u>Vale v. Vt. Mut. Ins. Grp.</u>, 112 A.D.3d 1011, 1013, 977 N.Y.S.2d 117, 120 (3d Dep't 2013) (stating that where party fails to comply with condition precedent requiring timely notice, delay may be excused if reasonable, which will generally be "question of fact for a jury"). Thus, while the district court identified February 27, 2009, the date Wilkicki received a draft appraisal for the City View Property, as "the absolute, drop-dead date" for a reasonable investigation to have concluded, a factfinder might determine that where, as here, the investigating party is not an individual but a corporate entity, some degree of chain-of-command review is part of a reasonable investigation, and the entity should be permitted to undertake such review before it is charged with discovering or becoming aware of the breach. Were the jury to so find in this case, it could extend the investigation's conclusion date to March 16, 2009, when Centerline's president was first asked to authorize the notice of breach and request for cure based on the investigation of his

subordinates. In that event, the March 18, 2009 transmittal would have been prompt even under a three-business-day limitation.[12]

Of course, even if a factfinder were to include chain-of-command review within a reasonable breach-investigation period, disputes might persist as to whether other events—e.g., commissioning the initial or review appraisals—unreasonably prolonged the investigation. While the district court dismissed

---

[12] Judge Wesley disagrees, observing that, under New York law, a corporation is charged with the knowledge of its agents. See Dissenting Op., post at 12. But none of the cited cases reach that conclusion in the context of a corporate entity conducting a breach investigation, much less one doing so as the agent of a trustee. New York University v. First Financial Insurance Co., 322 F.3d 750 (2d Cir. 2003), does not offer "precisely this situation," Dissenting Op., post at 17 n.12, because that case involved neither an agent acting on behalf of a trustee nor a breach investigation similar in nature or scope to the one at issue here. Instead, an insurer was there charged with its investigative agent's knowledge of breach as of the date the insured conceded certain facts to the agent that effectively admitted the breach precluding recovery under the insurance contract. See New York Univ. v. First Fin. Ins. Co., 332 F.3d at 753 & n.2. Here, Morgan Stanley did not similarly confirm its breach of the MLPA to Wilkicki. As already noted, in such circumstances, the law affords a reasonable time for investigation of breach to avoid creating an incentive for premature litigation. That concern supports including some chain-of-command review within a reasonable investigation, rather than demanding action as soon as any corporate agent reaches a conclusion regardless of his authority to act on it for the corporation. See Kirschner v. KPMG LLP, 15 N.Y.3d 446, 465, 912 N.Y.S.2d 508, 517 (2010) (acknowledging that, generally, only acts within scope of agents' authority are "presumptively imputed to their principals").

Wilkicki's explanations for these appraisals as implausible, when we view the record in the light most favorable to BNY, we cannot conclude that a reasonable factfinder was precluded as a matter of law from reaching any other conclusion. Thus, the dispute cannot be resolved on summary judgment. See, e.g., Dillon v. Morano, 497 F.3d 247, 253–54 (2d Cir. 2007) (vacating award of summary judgment where permissibility of defendant's conduct turned on explanation for it, which necessarily involved credibility determination that was question for jury).

Further, because request for cure is not a condition precedent, even if a factfinder were to conclude that the time for reasonable investigation of breach ended more than three business days before March 18, 2009, it would still have to decide the question of substantial performance.

"Substantial performance is performance, the deviations permitted being minor, unimportant, inadvertent, and unintentional." Cramer v. Esswein, 220 A.D. 10, 11, 220 N.Y.S. 634, 634 (2d Dep't 1927) (internal quotation marks omitted); see Bernard v. Las Ams. Commc'ns, Inc., 84 F.3d 103, 108 (2d Cir. 1996); Callanan Indus., Inc. v. Smiroldo, 100 A.D.2d 717, 718, 474 N.Y.S.2d 611, 612 (3d

Dep't 1984). Such deviations "will sometimes be atoned for by allowance of the resulting damage." Jacob & Youngs, Inc. v. Kent, 230 N.Y. 239, 241 (1921) (Cardozo, J.).

The question of substantial performance is usually one "of fact and should be decided as a matter of law only where the inferences are certain." Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d Cir. 2007) (collecting cases, including Hadden v. Consol. Edison Co. of N.Y., 34 N.Y.2d 88, 96, 356 N.Y.S.2d 249, 255 (1974) (assessing substantial performance on basis of several factors such as absolute and relative magnitude of default, its effect on contract's purpose, willfulness, and degree to which injured party was benefited under contract)). Thus, while BNY points to a number of factors supporting substantial performance, we do not here decide the question in its favor as a matter of law. We conclude only that the record does not permit substantial performance to be rejected as a matter of law. See Jacob & Youngs, Inc. v. Kent, 230 N.Y. at 243 (explaining that substantial performance is question of degree, which, "if there is doubt," must be answered by "triers of the facts").

In reaching that conclusion, we reiterate certain undisputed facts. First, BNY did transmit a request for cure to Morgan Stanley; thus, the only performance issue is timeliness. Second, the delay in transmittal, even on the district court's findings, was in the range of two to four weeks. Third, the noticed breach of representation was not curable, regardless of the date when BNY can be charged with awareness of the breach.

These circumstances strongly support substantial performance insofar as delay in requesting a cure that was never possible would likely be deemed trivial. As this court recently had occasion to note, "[w]hen contracting parties agree to a notice-and-cure provision, it is reasonable to assume that they do so with the assumption that the breaches which would be used to terminate the contract would be curable breaches." Giuffre Hyundai, Ltd. v. Hyundai Motor Am., 756 F.3d 204, 210 (2d Cir. 2014) (internal quotation marks omitted) (emphasis in original). Thus, "New York common law will not require strict compliance with a contractual notice-and-cure provision if providing an opportunity to cure would be useless." Id. at 209 (collecting cases).

38

Morgan Stanley attempts to distinguish <u>Giuffre</u> and the cases cited therein on the ground that they considered the propriety of actions taken by parties who, instead of providing opportunity to cure, terminated contracts or commenced actions for damages. It submits that the futility of cure here is no excuse for the Servicer's failure timely to request cure because that "is the only mechanism for Morgan Stanley's obligation to be triggered." Appellee Br. 46. The argument fails because, as we have already concluded, notice of breach, not request for cure, is the singular trigger for Morgan Stanley's remedy obligations. Further, it is by no means evident that the timeliness of notice is essential to this trigger because the 90-day cure period would not begin to run until notice was received and any harm to Morgan Stanley from a delay in notice could offset its remedy obligations. <u>See</u> 63 N.Y. Jur. 2d, Guaranty & Suretyship § 134 (2006) (stating that where giving notice within specified time is not condition precedent to liability, "consequence of not giving such notice may be to relieve or exonerate" the party entitled to notice "only to the extent of the damage sustained by reason of the omission"); <u>see also</u> <u>Jacob & Youngs, Inc. v. Kent</u>, 230 N.Y. at 241. Thus, the

impossibility of cure is properly recognized as a factor that here could weigh in favor of substantial performance on remand.

Accordingly, because the timeliness of the Special Servicer's request for cure should not have been determined as a matter of law and because a reasonable jury could find that, even if there was some delay in requesting cure, the Special Servicer substantially performed this MLPA obligation, these questions of timeliness and substantial performance cannot be decided in favor of Morgan Stanley on summary judgment but must be presented to the factfinder at trial.

## III. <u>Conclusion</u>

To summarize, we conclude as follows:

1.      "Notice to cure" is not a phrase that appears in the MLPA and, thus, cannot be identified as a condition precedent to Morgan Stanley's MLPA cure-or-repurchase obligation.

2.      The request-for-cure obligation that the MLPA imposes on the Special Servicer is properly construed as a promise rather than as a condition

precedent because it neither employs the linguistic conventions of condition nor serves as a trigger for the cure period at issue.

3.      Even if the MLPA's notice-of-breach obligation could be construed as a condition precedent because it triggers the 90-day cure period—a matter we need not decide as no party advances the argument—that rationale would not extend to the timeliness of the notice, which has no triggering effect, much less to a three-day time limitation, which does not cabin the notice-of-breach obligation as it does the request-for-cure obligation.

4.      The fact that the notice-of-breach obligation arises upon a party's "discovering" breach while the request-for-cure obligation arises upon a Servicer's "becoming aware" of the breach does not admit the categorical conclusion, urged by BNY, that the time for requesting cure cannot run before notice of breach is given, particularly where, as here, the Servicer is the party discovering breach.

5.      Under New York law, a reasonable time for investigation is afforded before a party can be said to have discovered or become aware of a breach.

6. Questions of fact as to the reasonableness of time taken to investigate the alleged breach of the MLPA's Environmental Conditions Representation preclude finding, as a matter of law, that request for cure was untimely, particularly when reviewed for substantial performance.

The judgment of the district court is, therefore, VACATED, and the case is REMANDED for further proceedings consistent with this opinion.

WESLEY, *Circuit Judge*, dissenting:

In concluding that a request to cure was not a condition precedent to Morgan Stanley's repurchase obligation and that issues of fact preclude summary judgment, the majority opinion both misapplies New York law and misreads the plain language of the contract. The result is, in essence, judicial reformation of the agreement, saving a sophisticated party from the requirements of the bargain it made following arms-length negotiation. Because I cannot agree with these conclusions, I respectfully dissent.

It is indeed the case that New York law requires conditions precedent to be "express"—that is, stated by the parties in "unmistakable language." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690–91 (1995) (internal quotation marks omitted). But there is no indication in *Oppenheimer* that the standard of "unmistakable language"—which the Court drew from the Second Restatement of Contracts—requires specific, talismanic words. *See Oppenheimer*, 86 N.Y.2d at 691 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 229 cmt. a (1981)). In fact, the Restatement clearly rejects that view: "No particular form of language is necessary to make an event a condition, although such words as 'on condition that,' 'provided that' and 'if' are often used for this

1

purpose. An intention to make a duty conditional may be manifested by the general nature of an agreement, as well as by specific language." RESTATEMENT (SECOND) OF CONTRACTS § 226 cmt. a.[1]

A recent case of the Court of Appeals confirms this analysis: the Court construed a provision requiring negotiation and execution of additional terms as an express condition precedent to a party's obligation to supply fiber-optic capacity but relied on no conditional words, identifying the parties' "clear intent" solely from the nature and structure of the agreement. *See IDT Corp. v. Tyco Grp., S.A.R.L.*, 13 N.Y.3d 209, 212, 214 (2009).[2] Similarly, lower New York courts have concluded that an express condition precedent exists "*despite the lack of explicitly conditional language*" so long as it "was unmistakably required" before another obligation came into force. *ALJ Capital I, L.P. v. David J. Joseph Co.*, 48 A.D.3d 208, 208 (N.Y. 1st Dep't 2008) (emphasis added); *see also Walton v. E.*

---

[1] *See also* 13 WILLISTON ON CONTRACTS § 38:16 (4th ed. 2000) ("Any words which, when properly interpreted or construed by the court, make clear the notion that the performance of a promise in a contract is dependent on some other act or event will create an express condition.").

[2] *Oppenheimer* itself also relied on a case in which absolutely *no* conditional language appeared: the contract simply required notice of shipment of goods, and the failure to provide such notice was deemed a "failure to 'perform[] all conditions precedent'" and "barred [plaintiff] from recovery." 86 N.Y.2d at 693–94 (first alteration in original) (quoting *Jungmann & Co. v. Atterbury Bros.*, 249 N.Y. 119, 122 (1928)).

*Analytical Labs, Inc.*, 246 A.D.2d 532, 533 (N.Y. 2d Dep't 1998) (finding condition precedent premised on the structure of the provision, notwithstanding the lack of conditional language); *Winfield Capital Corp. v. Mahopac Auto Glass, Inc.*, 208 A.D.2d 715, 715 (N.Y. 2d Dep't 1994) (same). In New York courts, therefore, specific words are strong evidence of, but not necessary to, conditions precedent; the core inquiry, as in all contracts, is to give effect to the parties' "clear intent," as expressed through the "unmistakable language" they use.

So what then does the language and structure of the contract—negotiated at arms' length by sophisticated commercial entities—tell us about breaches of the agreement and the remedies provided for those breaches? For ease of reference, here again are the three obligations as identified in the majority opinion, *ante*, at 15–16:

> 1. If a material breach exists, "the party discovering such . . . Material Breach shall promptly notify, in writing, the other party . . . ."
>
> 2. "Promptly (but in any event within three Business Days) upon becoming aware of any such . . . Material Breach, the Master Servicer shall, and the Special Servicer may, request that the Seller, not later than 90 days from the Seller's receipt of the notice of such . . . Material Breach, cure such . . . Material Breach . . . ."
>
> 3. "The Seller hereby covenants and agrees that, if any such . . . Material Breach cannot be corrected or cured in

3

all material aspects within the above cure period[], the Seller shall, on or before the termination of such cure period[], either (i) repurchase the affected Mortgage Loan . . . or (ii) . . . at its option replace, without recourse, any Mortgage Loan . . . to which such defect relates with a [substitute mortgage]."

J.A. 454–55. We can all agree the third clause clearly conditions Morgan Stanley's repurchase-or-replace obligation on the existence of a particular circumstance: that "any . . . Material Breach cannot be corrected or cured in all material aspects *within the above cure period*[]." J.A. 455 (emphasis added); *see* Majority Op., *ante*, at 21–22 (identifying this clause as an example of "unmistakable language of condition"). Similarly, we agree that this language makes the repurchase obligation dependent on the obligation to cure within the cure period. But where the majority opinion and I depart is whether that obligation to cure within the cure period arises from the notice of breach or from the request to cure.

The majority opinion concludes that because the ninety-day period is *calculated* from the date of the notice of breach, the cure period must be *triggered by* the notice. *See* Majority Op., *ante*, at 23 ("[A]s the MLPA makes clear, that cure period is triggered exclusively by 'the Seller's receipt of the *notice of . . . Material breach*,' not the Servicer's request for cure." (quoting J.A. 454)). I cannot agree: A

4

ninety-day clock may count down from the notice of breach, but it is only the request to cure that gives that clock any legal meaning. The ninety-day cure period is written as a clause in the middle of the request provision, which states that "the Special Servicer may[] request that the Seller, *not later than 90 days from the Seller's receipt of the notice of such . . . Material Breach*, cure such . . . Material Breach." J.A. 454 (emphasis added). In other words, the ninety days and their legal significance are a part of the Special Servicer's request. If there were no request, ninety days would pass—in time's typical fashion—but it would not be a legally significant "cure period" for purposes of the repurchase obligation because no one had requested *cure* by that date.

The majority opinion seems disturbed by the fact the deadline for cure is not counted down from the request for cure and so concludes that the request itself has no conditional force over the repurchase obligation. But the repurchase obligation depends on the Seller not curing the breach within the cure period; that circumstance can only exist if the Special Servicer first makes a request to cure, which includes (and creates) the obligation to cure and the legal deadline for it. Nothing about the fact that the deadline is established ninety days after another event changes the fact that it is the *request* that brings it into existence.

5

For example, imagine two parties enter into a contract that reads: "Upon becoming aware of a material breach, the Special Servicer may request that the Seller, not later than ten days following the next full moon, cure such material breach." An obligation to cure within the cure period does not come into existence as a result of the lunar cycle; it is triggered by the request—the "not later than" clause simply provides a way to determine the deadline by which the Seller must comply. Put simply, the request identifies an object (cure) and a deadline (ninety days following a particular identified event); absent any request, there is no object and no deadline.[3]

This interpretation is confirmed by a simple counterfactual: If the Special Servicer had exercised its option *not* to request cure, would Morgan Stanley still

---

[3] Stepping back, it makes sense that the request to cure calculates its deadline from the notice of breach. Either party—the Seller or the Special Servicer—may be the one to discover the breach in the first instance and must then notify the other party. *See* J.A. 454. If the Seller discovers the breach and provides notice, the Special Servicer then has three days to decide whether to request cure or lose its right to do so. If it chooses to exercise its right to request cure on day three, there may be only eighty-seven days until the end of the cure period—but the Seller already had three days of notice, by its own discovery, of the nature and circumstances of the breach. By contrast, if the Special Servicer discovers the breach, it can both notify the Seller of breach and request cure in the same document, in which case the Seller has the same ninety days of notice. In either event, this system ensures that the Seller has exactly ninety days of knowing about the breach, no more and no less, before the deadline occurs.

6

have been obliged to cure or repurchase the loan?  The answer—on the plain face

of the contract—must be "no."   The contract is conspicuously lacking any

language making cure of every material breach obligatory on the Seller *absent* a

request to cure.[4]  To construe the contract in that way would require reading the

repurchase obligation as creating, *sub silentio*, an obligation to cure that arises

simply from notification of breach.[5]  It is simply unfathomable that the parties

---

[4] The majority opinion suggests this consideration is irrelevant because the MLPA assigned the signaling function to the notice of breach and because the Master Servicer had a "mandatory request-for-cure obligation."  Majority Op., *ante*, at 25 n.10.  However, the loan at issue was transferred to the Special Servicer in November 2008, *see* Majority Op., *ante*, at 7, at which point the Master Servicer ceased to be "obligated to service and administer" the loan except as to certain specified functions, none of which include requesting cure, *see* J.A. 217. Only the Special Servicer's contractual rights and obligations are therefore relevant, and while the MLPA provided that the Master Servicer "shall" request cure, it provided only that the Special Servicer "may" request cure.  J.A. 454. "May" in this context can only possess a permissive, rather than mandatory, meaning, *see N.Y. State Elec. & Gas Corp. v. Aasen*, 157 A.D.2d 965, 967 (N.Y. 3d Dep't 1990), and the MLPA thus imposed no obligation on the Special Servicer to request cure.  As I have explained, notice of a breach does not trigger the obligation to cure the breach—the *request* to cure is what obliges the Seller to cure within the defined cure period.  A request to cure by the Special Servicer therefore told the Seller that the former was exercising its option to demand cure, providing exactly the same signaling and demand functions as the notice of disallowance in *ALJ Capital*.  *See infra* note 7; *see also* Majority Op., *ante*, at 23 (acknowledging *ALJ Capital*'s notice as a condition precedent).

[5] As described above, if the Special Servicer decides not to request a cure, then the date of the notification of breach has no legal significance—ninety days later, nothing happens, and no one cares.

would silently imply, rather than lay out explicitly, such a significant obligation as one requiring cure of *every* material breach for which a notice of breach was transmitted. Instead, the parties explicitly conditioned the repurchase obligation on the running of the cure period without actual cure, and the cure period only comes into existence through the Special Servicer's request.[6]

Compare this framework with the provisions considered by district courts in our Circuit that have concluded timely notice did not constitute a condition precedent to repurchase obligations: in those cases, the obligation was triggered by *either* a party's discovery of its own breach *or* its counterparty's notification— *i.e.*, the obligation could come into existence through a mechanism other than a request to cure. *See LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7868 (HB), 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003); *Tr. for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ. 9890(SAS), 2005 WL 2582177, at *7 (S.D.N.Y. Oct. 11, 2005); *see also U.S. Bank Nat'l Ass'n v. Dexia Real Estate Capital Mkts.*, No. 12-CV-9412, 2014 WL 3368670, at *4 (S.D.N.Y. July 9, 2014), *rev'd on other grounds*, No. 14-

---

[6] The majority opinion appears distracted by the District Court's "notice to cure" misnomer—but we are engaged in *de novo* review, and even if we were applying a more deferential standard, we are certainly not obligated to accept the District Court's labels.

2859-cv, 2016 WL 1042090 (2d Cir. Mar. 18, 2016) (summary order).  Here, by contrast, there is no indication anywhere in the contract that Morgan Stanley's discovery of its own breach requires it to do anything other than "promptly notify, in writing, the other party."  J.A. 454; *see Morgan Guar. Tr. Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.*, No. 00 CIV. 8613(SAS), 2002 WL 818082, at *4–5 (S.D.N.Y. Apr. 30, 2002) (concluding that a request to cure was necessary to begin cure period, the expiration of which required the seller to repurchase the loan).

In sum, regardless of whether the parties used any particular conditional words, the language of the repurchase obligation is "clear" and "unmistakable" that it arises only when cure does not occur within the cure period—and cure within the period is an obligation that arises only out of the Special Servicer's request.  *See ALJ Capital*, 48 A.D.3d at 208.[7]  Because the language and structure of the provision makes the repurchase obligation unmistakably contingent on the

---

[7] In fact, *ALJ* concerned just such a timely notice provision triggering a cure period, after which time the plaintiff was permitted to seek recovery in court.  *See ALJ Capital I, L.P. v. David J. Joseph Co.*, 15 Misc. 3d 1127(A), 2007 WL 1218355, at *4–5 (N.Y. Sup. Ct. Mar. 13, 2007).  The First Department affirmed the trial court's conclusion that timely notice was a condition precedent "despite the lack of explicitly conditional language" because the written notice "was unmistakably required by the agreement's 'Cure Period' provision prior to the assertion of a claim for repayment."  *ALJ Capital*, 48 A.D.3d at 208.

9

Special Servicer's request to cure, that request must necessarily constitute an express condition precedent. *See IDT Corp.*, 13 N.Y.3d at 214.

Express conditions precedent are subject to "the requirement of strict compliance," in contrast to promises or constructive conditions, with which only "substantial compliance" is required. *Oppenheimer*, 86 N.Y.2d at 690, 692 (internal quotation marks omitted). Further, "no mitigating standard of materiality or substantiality [is] applicable to the non-occurrence of [an express condition precedent]." *Id.* at 692 (internal quotation marks omitted). Consequently, once we determine that a request to cure "within three Business Days[] upon becoming aware" of the material breach, J.A. 454, is an express condition precedent to the repurchase obligation, the only remaining question on summary judgment is whether there exists any genuine issue of material fact as to the Special Servicer's strict compliance with that condition. Under longstanding New York law, no reasonable factfinder could determine that the Special Servicer only became aware of the material breach on or after March 15, 2009—*i.e.*, three days before the date of the request to cure.[8]

---

[8] Because the majority opinion concludes the request to cure was merely a promise, it analyzes the facts under the rubric of substantial compliance and concludes summary judgment is inappropriate because reasonable factfinders may differ as to the extent of any "reasonable investigation" including "some

As the majority opinion explains, the material breach identified here is premised on Morgan Stanley's representation that it had no knowledge of any "material and adverse environmental condition or circumstance affecting any Mortgaged Property that was not disclosed in such report."  J.A. 625; *see also* Majority Op., *ante*, at 8 & n.3.  The Special Servicer's conclusion that a breach of this representation had occurred rested primarily on a document showing that Morgan Stanley's counsel knew the environmental report neither addressed a relevant state regulation nor the notices of violation issued thereunder; in fact, this was the only piece of evidence identified in the formal notice of breach and request to cure.  *See* J.A. 625–26.  However, in a document sent to the Special Servicer's Associate General Counsel on February 16, 2009, the Director of Special Servicing—and the woman who ultimately signed the notice of breach and request to cure—identified "additional facts . . . to demonstrate the material and adverse effect" of the breach, including the anchor tenant's departure and subsequent lease terminations by other tenants, "discontinued . . . loan payments to the Trust in November 2008 as a direct result of insufficient operating

degree of chain-of-command review."  Majority Op., *ante*, at 33–38.  Even under a substantial compliance analysis, however, as explained *infra*, New York law and the undisputed facts would require us to conclude that the Special Servicer became aware of the breach as of at least February 16, 2009.

11

income," and rejection of the borrower's insurance claim under a pollution legal liability policy. J.A. 896–98.

The majority opinion's approach places great weight on the internal governance structure of the Special Servicer, essentially permitting the corporation to deny its "awareness" of a fact simply because it required authorization by the president to issue the notice. *See* Majority Op., *ante*, at 34–36. But "a fundamental principle that has informed the law of agency and corporations for centuries" is that "the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010); *accord Corrigan v. Bobbs-Merrill Co.*, 228 N.Y. 58, 68 (1920) (explaining that, if the employee of a corporation obtains knowledge "while acting within the scope of his authority, on behalf of [the corporation], for its benefit, [the corporation] is chargeable with his knowledge").[9] This presumption of corporate knowledge is conclusive, even if the corporate employee *never* communicated the information to her superiors:

---

[9] As a corporate legal entity, the Special Servicer "necessarily functions through human actors—its officers, agents and employees—whose knowledge and conduct may be imputed to the entity under the doctrine of respondeat superior." *Prudential-Bache Sec., Inc. v. Citibank, N.A.*, 73 N.Y.2d 263, 276 (1989).

> [N]otice of facts to an agent is constructive notice thereof to the principal himself, where it arises from or is at the time connected with the subject-matter of his agency, for, upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal, and, if he has not, still the principal having [e]ntrusted the agent with the particular business, the other party has a right to deem his acts and knowledge obligatory upon the principal.

*Hyatt v. Clark*, 118 N.Y. 563, 569 (1890); *accord N.Y. Univ. v. First Fin. Ins. Co.*, 322 F.3d 750, 753 & n.2 (2d Cir. 2003) (applying these principles to a timeliness inquiry and calculating the insurer's delay in notice from the date its investigator discovered grounds for liability); *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76–77 (2d Cir. 1999) (applying the same rule to conclude the corporation knew of intentional misconduct through its employees' knowledge). This rule applies even where such knowledge works the waiver of a contractual right and the corporate agent does not have any authorization under the contract to make such a waiver affirmatively. *See, e.g.*, *Hurley v. John Hancock Mut. Life Ins. Co.*, 247 A.D. 547, 550 (N.Y. 4th Dep't 1936).

Put simply, as a matter of law, the Special Servicer knew the facts of the breach and their material and adverse effect on the loan well before March 15, 2009. The Director of Special Servicing drafted a memorandum containing sufficient facts to constitute awareness of both the breach and its material and

adverse effects on February 16, 2009.[10] Even after that, on February 19, 2009, an Associate General Counsel at the company confirmed that "there is evidence that [Morgan Stanley] knew" there were undisclosed environmental conditions in breach of the representation and concluded "I think that the breach notice should be sent." J.A. 1266. Yet, despite *two* employees responsible for investigating material breaches concluding there was sufficient evidence of such a breach, no notice was sent until March 18, 2009, during which time no new material facts were obtained by the Special Servicer. Though the Trustee's brief makes much of the fact that neither the Director of Special Servicing nor the Associate General Counsel had authority to issue a notice of breach, authority to make the ultimate decision is irrelevant to imputation; what matters is whether the knowledge was obtained within the scope of the employee or agent's employment. *See N.Y. Univ.*, 322 F.3d at 753 & n.2; *Hyatt*, 118 N.Y. at 569; *Hurley*, 247 A.D. at 550. There can be no dispute that the Director of Special Servicing, who ultimately *signed* the

---

[10] Note also that this memorandum was based on an investigation of the loan's status beginning in November 2008. *See* J.A. 1109–15. Thus, we are not even considering a situation in which the corporation merely had access to (and thus only arguably constructive notice of) these facts—the February 16, 2009 memorandum memorializes facts *actually known* by the Director of Special Servicing. *See* J.A. 1111–17. To borrow the majority opinion's analogy, *see* Majority Op., *ante*, at 31 n.11, she was aware both that she had found the Americas (the fact) and that they were new (its significance).

formal notice of breach and request to cure, *see* J.A. 626, obtained her knowledge of the breach and its effects in the scope of her authority to investigate potential breaches. *See* J.A. 1110–11; *see also N.Y. Univ.*, 322 F.3d at 753 & n.2 (calculating delay in insurance coverage denial from the date the investigator learned of the grounds for denial, notwithstanding his lack of authority to deny coverage himself).

Just as importantly, none of the post–February 16 activities described by the majority opinion contributed in any material way to the Special Servicer's "awareness" of any breach. None of the internal "chain of command" reviews— not the *removal* of one paragraph of supporting facts from the notice and request to cure by the Associate General Counsel, *see* J.A. 1341–45, nor the approvals without change by both a senior managing director and the president of the company, *see* J.A. 1347, 1829–30—made any additional facts available to the corporation, either of the nature of the breach or of its material and adverse effects. The only potentially new fact arose from the appraisal setting the collateral's market value at $22.3 million, the initial estimate of which was received on February 27, 2009. *See* J.A. 1739. The Trustee argues that this appraisal was needed "to confirm that Morgan Stanley's breach was 'material'

under the terms of the MLPA."  Appellant Br. 17.  But this lone data point could hardly have tipped the scales of the Special Servicer's awareness of the breach's materiality in light of what it already knew as of February 16, 2009:

> (1) The loan was in default;
>
> (2) The anchor tenant had departed, which precipitated rent reductions, lease terminations, and discontinued rent payments by other tenants;
>
> (3) An Ohio regulatory body had filed a lawsuit against the borrower arising from the same environmental regulatory violations at issue in the breach;
>
> (4) The borrower's insurance claim for the legal liability was denied;
>
> (5) The Trust was seeking receivership for the property; and
>
> (6) The Trust would have to fund any legal costs associated with attempts to recoup value.

*See* J.A. 619, 897–98.  The substantive portion of the February 16, 2009 memorandum concluded with these words: "All of the above results stem from the state code violations which were present prior to, during and after the sale of the Mortgage Loan to the Trust. The Mortgage Loan should be repurchased pursuant to the terms and conditions set forth in the PSA and the applicable MLPA."  J.A. 898.  It exceeds all bounds of credulity to think that, in the face of

all these known facts, the Special Servicer was anything but aware of the circumstances of the breach as well as its material and adverse consequences.[11]

The majority opinion's approach thus drastically departs from New York law governing corporate knowledge and timely request obligations under a contract. Under the majority opinion, all any corporation need do now is require authorization for such requests at its highest level—and regardless of the facts known by employees below the highest executive officer, the corporation cannot be charged with "awareness" of those facts.[12] Not only is this type of passing-the-buck approach wholly contrary to "a fundamental principle that has

---

[11] Even accepting the dubious proposition that confirmation of the loan valuation somehow moved the Special Servicer from "unaware" to "aware," that appraisal was confirmed on March 13, 2009. *See* J.A. 1730; Majority Op., *ante*, at 10. It took another five days for the Special Servicer to send the notice of breach and request to cure. *See* J.A. 624–26.

[12] The majority opinion criticizes this dissent for not citing cases related to investigations by agents and employees. *See* Majority Op., *ante*, at 35 n.12. However, our prior decision in *New York University* offers precisely this situation: a line investigator at a company contracted as an insurer's agent discovered grounds for denying coverage, and that knowledge was imputed to the insurer for purposes of determining timeliness. *See* 322 F.3d at 753 & n.2. The majority opinion's error arises from its failure to recognize that investigation was clearly within the scope of the Director of Special Servicing's employment, regardless of her ability to take some subsequent external action on behalf of the company. The results of her investigation—*i.e.*, knowledge of the facts and significance of breach—are therefore imputed to the Special Servicer, who must then take whatever steps are necessary in its internal governance structure to act within the time provided by the contract.

17

informed the law of agency and corporations for centuries," *Kirschner*, 15 N.Y.3d at 465, but it would completely defeat the purpose of a temporal limitation on a contractual remedy—namely, the valuable certainty and diligence obtained when a sophisticated counterparty must exercise that remedy within a defined period of time. Particularly when a timely request is a condition precedent to a contractual remedy, requiring strict compliance, the majority opinion's approach dramatically undercuts the force and value of such provisions.

The *Oppenheimer* Court considered and rejected a rule that would obviate the harsh consequences of an express condition precedent, concluding that strict compliance was necessary. *See* 86 N.Y.2d at 691–92. Yet the majority opinion here releases a sophisticated party from the burden of complying with the agreement it made. At the risk of stating the obvious, if the corporation's internal governance did not permit a three-day turnaround between awareness of breach and a request to cure, it should have bargained for more time.[13] On these facts, no reasonable factfinder could determine that the Special Servicer

---

[13] "Freedom of contract prevails in an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain. If they are dissatisfied with the consequences of their agreement, the time to say so was at the bargaining table." *Oppenheimer*, 86 N.Y.2d at 695 (alteration and internal quotation marks omitted).

only became aware of the breach on or after March 15, 2009. As a result, no reasonable factfinder could find strict compliance with the condition precedent to Morgan Stanley's repurchase obligation, and that obligation never came into force.

I respectfully dissent.